In the Matter of the Libel and Petition of CHINA UNION LINES, LTD., Owner of the S.S. UNION RELIANCE, in a Cause of Exoneration from or Limitation of Liability.

No. 2018.

United States District Court
S. D. Texas,
Houston Division.
July 17, 1963.

Robert Eikel, Eikel, Feltner & Goller, Clarence Eastham, Eastham, Watson, Dale & Forney, Houston, Tex., E. F. Platow, Platow & Lyon, New York City, for China Union Lines.

Ben G. Sewell, trustee, McGregor, Sewell, Junell & Riggs, Houston, Tex., Preston Shirley, McLeod, Mills, Shirley & Alexander, Galveston, Tex., for trustee.

Bryan F. Williams, Jr., Royston, Rayzor & Cook, Galveston, Tex., Carl O. Bue, Jr., Royston, Rayzor & Cook, Frank G. Harmon, Baker, Botts, Shepherd & Coates, Houston, Tex., for M/V Berean and A. O. Andersen Co.

Jack Shepherd, Houston, Tex., Thomas F. McGovern, Washington, D. C., for the United States.

James E. Ross, Houston, Tex., for American Cyanamid Co.

E. V. Greenwood, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Deutsch, Kerrigan & Stiles, New Orleans, La., for Mitsubishi Co. and others.

Newton B. Schwartz, Schwartz & Lapin, Houston, Tex., for Lan Jing-Chau and others.

J. Donald Stillwell, Houston, Tex., for claimant Lucy Duncan.

Newton M. Crain, Jr., Blades, Crain, Slator & Winters, Houston, Tex., for Geo. D. Emery Co., Otto Gerdau Co., Chem-Fleur, Charles H. Demarest, Heinsheimer Bros., Formost Tea Corp., Magnus Mabee, etc.

R. Philip Schulze, Houston, Tex., for Danner's Marine Service.

Ed Schwab, III, Levy & Levy, Galveston, Tex., for Todd Shipyards.

Charles E. Lugenbuhl, Lemle & Kelleher, New Orleans, La., for Abaunza S.S. Co.

Dan Hinds, Hinds & Meyer, Houston, Tex., for Armement Deppe, S. A. and Big State Barging Co.

Myron M. Sheinfeld, Wm. P. Hamblen, Jr., Houston, Tex., Commissioners.

CONNALLY, Chief Judge.

## PRELIMINARY STATEMENT

At approximately 11:15 p. m. on the night of November 7, 1961, the Chinese Motor Vessel UNION RELIANCE and the Norwegian Motor Tanker BEREAN were in collision in that portion of the Houston Ship Channel which crosses Galveston Bay. As a result, twelve lives were lost and certain personal injuries were sustained aboard the UNION RELIANCE. Both vessels were damaged and damage was done to the cargo aboard each vessel.

Both vessels caught fire, though the fire aboard the BEREAN was extinguished within a matter of a few hours. The UNION RELIANCE remained ablaze and at anchor, blocking the Houston Ship Channel at a point close to Buoy No. 73. On November 10, 1961, while still ablaze to such extent that no one could board her, the UNION RELIANCE was towed by the United States Corps of Engineers to Galveston Harbor, where she was anchored.

## THE LITIGATION

Shortly thereafter, the United States of America filed her libel *in rem* against the UNION RELIANCE seeking the im-

mediate sale of the vessel and the recovery of the expenses incurred by the United States in removing her from the Houston Ship Channel and for safeguarding her while at anchorage. Shortly thereafter, China Union Lines, Ltd., owner of the UNION RELIANCE, filed its petition for exoneration or limitation of liability; and on November 29, 1961, obtained the customary order from this Court prohibiting the prosecution of claims against the vessel or her owner, except in the limitation proceeding.

In connection with its petition to limit, China Union Lines elected to surrender its interest in the vessel and her pending freight to a court appointed trustee. Ben G. Sewell, Esq. was appointed Trustee and entered upon his duties. Upon the recommendation of proctor for petitioner, and a need therefor appearing, the Court appointed J. R. Bencal, a competent and experienced marine surveyor, (and who had been employed in that capacity to represent petitioner's interest from the inception) as salvage master, and authorized such salvage master to undertake the steps necessary to extinguish the fire in the vessel's holds and to bring her into port for the purpose of discharging her remaining cargo preparatory to sale.

Meanwhile, in other proceedings in this Court, China Union Lines had filed its libel against the BEREAN. Her owner, A. O. Andersen & Co., Inc., appeared, claimed the vessel, answered and cross-libeled against China Union Lines. The owners and underwriters of the lost and damaged cargo aboard UNION RELIANCE filed their libel against BEREAN and her owners. Similarly, American Cyanamid Company, the owner of the only cargo lost aboard BEREAN, filed its libel against UNION RELIANCE.

The officers and members of the crew of UNION RELIANCE who were killed or injured all were Nationals of the Republic of China. The Consul of that government, residing in Houston, sought to recover for these injuries and deaths, against both vessels. Also killed as a result of the collision was the Houston Ship Channel Pilot (Captain Duncan) aboard UNION RELIANCE, whose widow, Lucy Duncan, has made claim against UNION RELIANCE and her owners.

Thereafter came several claims by owners of ships which allegedly were delayed by the blocking of the Houston Ship Channel for a period of some two days.

Additionally, China Union Lines, and the owners and underwriters of the cargo aboard UNION RELIANCE and various other parties filed separate libels directly against American Cyanamid, as owner of the cargo of BEREAN. It was the theory of these libels that the acrylonitrile carried by BEREAN, and which had spread, caught fire, and ignited the two vessels, was of such dangerous nature and propensity as to render the owner-shipper liable to the injured parties.

### PRE-TRIAL DEVELOPMENTS

Pursuant to the order of the Court appointing him salvage master, J. R. Bencal, working in close connection with proctor for petitioner, secured equipment and services with which he was able to extinguish the fire aboard UNION RELIANCE. Thereafter she was brought into the port of Galveston, her cargo was discharged, and she was made ready for sale. Under order of Court, the remains of the vessel were sold by the Trustee for a gross price of approximately $109,000.00.

Thereafter application was made to the Court and to the Trustee for the immediate payment from these proceeds of sale for services and materials furnished at the request of the salvage master. Petitioner sought to be reimbursed for sums expended in this fashion. The United States sought to recover its expenses in moving and safeguarding the vessel, as salvage claims. The firemen, and those furnishing the equipment used in combating the fire, made similar claims. After one or more hearings with respect thereto, this Court

entered an order on March 12, 1962, by which provision was made for their disposition. That order was made the subject of an interlocutory appeal which originally was allowed by the Court of Appeals for the Fifth Circuit. After hearing, however, the order allowing the appeal was vacated and the cause remanded to this Court for further proceedings (306 F.2d 135). Thereafter, extensive hearings again were held by this Court resulting in the order of January 28, 1963, directing the immediate payment of certain salvage claims, and deferring the payment of the remainder of such claims pending a decision on the issue of liability.

This maze of litigation was consolidated, and the pleadings amended so as properly to tender to the Court all issues of liability.

## THE TRIAL

■ Trial on the issue of liability alone commenced March 11, 1963, and proceeded until April 12, 1963. The Court heard witnesses from among the officers and crews of each vessel, and others, and received voluminous documentary evidence. At the close of petitioner's case, the Court afforded all parties an opportunity to introduce evidence bearing on the issue of the liability of American Cyanamid Company; and was advised by all counsel that the claim against American Cyanamid rested solely on the evidence produced by petitioner. The Court was of the view that petitioner had failed to show a cause of action against American Cyanamid on behalf of UNION RELIANCE, her cargo interests, or others, and dismissed the libels against that respondent.

## FINDINGS OF FACT

*The Vessels and Their Owners*

1. The petitioner in limitation, China Union Lines, Ltd., is a private corporation organized and doing business under the laws of the Republic of China, having its principal office in Taipei, Taiwan.

2. The UNION RELIANCE was a steel motor ship, 496 feet in length, designed for the carriage of dry cargo, built in the United States in 1940. Having served several owners under several flags, she was purchased from Greek nationals by China Union Lines, Ltd., in April, 1961.

3. UNION RELIANCE was one of only four vessels constructed in the same yard and at about the same time, with main engines of this type. She was fitted with four diesels, controlled in pairs, and equipped with electromagnetic couplings, through which the power of either or both pairs, operating either ahead or astern, could be transmitted to the propeller shaft. These engines were designed to give 240 engine revolutions per minute, and, with a 3–1 gear ratio, to give 80 revolutions of the shaft per minute. As will be noted more in detail hereafter, however, by reason of age, wear and poor maintenance, at all times material to this proceeding, the engines were not capable of approaching this efficiency.

To change the direction in which power is imparted to the propeller shaft (that is, if the propeller is driving the vessel forward, and if it is desired to impart astern power), it was necessary to stop the engines by cutting off the fuel supply, to change the cam setting, and to restart the engines.

With all four engines operating at or near design efficiency, one pair of engines normally produced sufficient power, and revolutions of the shaft, for routine harbor maneuvering. Hence the design permitted—and contemplated—one pair of engines to be kept running ahead, and the other pair kept running astern at all times while the vessel was in pilot waters. Thus the engineer could reverse the direction of the screw by a simple maneuver of uncoupling one set of engines, and coupling on the others. When desirable, all four engines could be coupled to the shaft to give maximum power either ahead or astern. This was not a difficult or time consuming operation, and could be accomplished by competent engine room personnel in a matter of approximately one minute.

4. The UNION RELIANCE was equipped with a hydraulic steering system, located in the steering engine room (to be distinguished from the engine room, where the main engines were installed). Hydraulic rams served to move the rudder in the desired direction. Hydraulic fluid (or telemotor oil) under great pressure actuated the rams.

Two separate and distinct steering systems were available to force the hydraulic fluid, under pressure, through the system and against the rams. These were used alternatively; while one was in use, the other served as standby.

The principal component of each such steering system was a large pump. The pump was powered by a 50 horsepower electric motor. There were a number of auxiliary pumps and motors, of particular relevance here being a small so-called "replenishing pump."

In normal operation, hydraulic fluid escaped from the system and was collected in a sump tank. It was then lifted by means of this replenishing pump to an overhead replenishing tank, from which point it was fed back into the system for further use through gravity. The replenishing pump was powered by a one horsepower electric motor.

Some 35 gallons of hydraulic fluid were required to fill each system. While some minor leakage was expected, in normal operation it should have been necessary to add only small quantities of fluid at infrequent intervals.

5. The BEREAN was built in Norway and delivered to her owner and operator, A/S A. O. Andersen & Co., a Norwegian corporation, in April, 1961. She is 508 feet long, 65 feet in beam, powered by one 9000 horsepower diesel engine. She has no midships house; her navigating bridge is in the forward part of the after house, some 350 feet from the bow.

6. The cargo space of the BEREAN is divided into 42 tanks. She is designed and equipped to carry many varieties of bulk liquids. Some tanks are stainless steel lined; others are equipped with heating coils for handling viscous liquids, etc. She had been engaged in the chemical trade during the several months following her construction and prior to the collision, carrying various kinds of petroleum products and other flammable liquids. The shell of the ship constitutes the outer wall of certain of her wing tanks. There were no protective cofferdams or protective voids surrounding such tanks. Under pertinent Coast Guard regulations, those tanks may not be used to carry "flammable or combustible liquids having lethal characteristics", under 46 C.F.R., Part 39.

*The Cargoes and Movements Preceding the Casualty*

7. Following her purchase from Greek interests, UNION RELIANCE sailed from Piraeus, Greece, through the Mediterranean and to the United States, calling at Tampa, Florida, and New Orleans, Louisiana. By this time her Captain and crew had discovered that extensive repairs were needed in the engine room, the most immediate need being for an overhaul of the engine control mechanism. A marine surveyor and engine expert, one Spindanger, together with an officer of petitioner, flew from New York to New Orleans to supervise these repairs. While these repairs to the engine controls were underway, each of the four main engines was opened, and the cylinder heads were found badly worn and eroded. Replacements were not readily available and the old cylinder heads were reinstalled. Spindanger made a full report to the owners of the work which he had accomplished, and of other work which he recommended, to place the engine room in proper condition. While the New York office of petitioner was aware of the contents of this report promptly, it was not received in Taiwan until after the collision.

On departing New Orleans, UNION RELIANCE proceeded to Houston, thence through the Panama Canal, up the Pacific Coast, and thence to Japan and Taiwan. Additional engine repairs were accomplished in Taiwan.

Her Captain, chief engineer and others of her complement were replaced, and the officers and crew who were aboard at the time of the casualty took over the vessel in Taiwan. She loaded a general cargo there and in Japan for carriage to the United States. She discharged a part of this cargo at Los Angeles and received aboard at that port five of the large number of piston heads which were needed for her main engines. However, these were never installed prior to the collision. From Los Angeles, she proceeded through the Panama Canal en route to Gulf Ports.

8. The UNION RELIANCE arrived in Houston November 5, 1961, discharged a portion of her cargo and left the Houston dock at 6:30 p. m. November 7. She proceeded seaward, unassisted by tugs, and with Houston Ship Channel Pilot Duncan on her bridge. She was drawing approximately 16 feet 8 inches forward and 23 feet 5 inches aft.

9. At approximately 8:30 p. m., while UNION RELIANCE was in the vicinity of Adams Terminal, she suffered a failure of the starboard steering system which was in use at the time. The engines were stopped, the anchors dropped, and the vessel brought to rest. The starboard steering system was disconnected, and the port system connected. It was tested by turning the wheel a number of times, and the rudder indicator showed that the rudder responded, and that the port system was operating properly. The anchors were lifted and the vessel again got underway. This was at about 9:00 p. m.

Repairs were promptly undertaken on the starboard steering system. It was found that a brush holder on the 50 horsepower electric motor which operated the starboard steering pump was defective. The chief electrician undertook to repair the damaged part and had done so, but had not replaced the part in the engine. Hence the starboard steering system was not in operating condition from that moment forward.

The UNION RELIANCE proceeded outward from this point with the port steering system apparently functioning properly until shortly before the collision.

10. On November 6, 1961, the BEREAN loaded 14 tons of acrylonitrile at Good Hope, Louisiana. Upon the direction of the officers of the vessel, this shipment was placed in the forwardmost cargo tanks of the BEREAN, being No. 1 port, No. 1 center, and No. 1 starboard.

11. Acrylonitrile is similar to gasoline in its burning and explosive characteristics. However, it is highly toxic, and gives off poisonous and dangerous fumes. These fumes will cause illness to a person exposed thereto in relatively weak concentrations over a prolonged period of time; and may cause illness or death from a single exposure if in a sufficiently high concentration. The symptoms of acrylonitrile poisoning are somewhat similar to those of cyanide poisoning. Acrylonitrile is and was at the time of the casualty classified under pertinent Coast Guard regulations as a Grade C flammable liquid (46 C.F.R. 146.21–100), as is gasoline, benzine, naphtha, etc. It is not classified as an "extremely dangerous poison", nor as a "less dangerous poison" (46 C.F.R. 146.-25–5; 146.25–10).

12. The BEREAN arrived at the Galveston Bar at approximately 9:15 p. m. on November 7, 1961. In addition to the acrylonitrile mentioned above, BEREAN carried a mixed cargo of bulk liquids. She was drawing 19 feet forward and 25 feet aft. Houston Ship Channel Pilot Lary boarded the BEREAN in the vicinity of the sea buoy and assumed active control of her navigation as she was proceeding inbound toward Houston.

13. From the sea buoy to the point of the collision and beyond, the Houston Ship Channel passes through the open and unobstructed waters of Galveston Bay. The channel has a dredged width of 400 feet and depth of 36 feet. Crossing Galveston Bay, the channel is relatively straight. When weather conditions are favorable, it is the custom and practice of most vessels to navigate this

portion of the channel at "full ahead", except when passing other ships.

From Morgan's Point inward to Houston (being that portion of the channel which the UNION RELIANCE had navigated prior to the collision), the channel is more tortuous; there are many shoreside installations. Thus a vessel is required to maneuver to a far greater extent than in that portion of the channel outward from Morgan's Point.

14. During the course of her passage from the sea buoy to the point of collision, Pilot Lary, her second mate (Haugen) and a helmsman were on the BEREAN's bridge at all times. Her captain (Larsen) was on the bridge a majority of the time, although he had repaired to his cabin shortly before the emergency presented itself, and returned to the bridge only moments before the collision. The helmsman was relieved at the wheel every hour on the hour, and it was his duty then to proceed to the bow of the ship to serve as lookout for an hour, before returning to duty at the wheel. However, the practice was followed on the BEREAN, when weather and visibility were favorable and the vessel was proceeding routinely, to permit the helmsman a 10–15 minute "coffee break" after leaving the wheel before proceeding to the bow. It was during this interval that the emergency arose.

Both bow anchors of the BEREAN were ready to be let go, but BEREAN had no one standing by the windlass to serve as anchor watch. By reason of the nature of the channel in that area, as set out above, it was not customary to have an anchor watch standing by, because normally there was no occasion to use an anchor to maneuver until reaching Morgan's Point.

15. The collision occurred in the Houston Ship Channel at a point between Five Mile Point and Red Fish Reef. At Five Mile Point (Beacons 75 and 76), the Ship Channel requires a turn of about 15 degrees to port from an outbound vessel, as was the UNION RELIANCE. From the point of this bend, to the scene of the collision and beyond, the channel is straight. Buoy 73 is located on the west side of the channel approximately seven-tenths of a mile below Beacon 75. Beacons 71 and 72 are located opposite one another, at a point approximately seven-tenths of a mile below Beacon 73.

16. At 11:00 p. m. on the night of November 7, 1961, in this area the visibility was good, the night clear, with a slight flood tide running, with the wind northerly at approximately 8 miles per hour.

17. UNION RELIANCE was navigating at a speed of 9–10 knots over the ground when she made the bend at Five Mile Point. Each vessel saw the lights of the other at about this time. BEREAN blew a one blast signal, which was not answered by UNION RELIANCE.

18. In negotiating this turn, UNION RELIANCE navigated somewhat to her starboard side of the channel, and away from the center line of the channel. This was noted and commented upon by the pilot of the BEREAN. This maneuver was of little consequence, however, and did not cause the vessel to sheer away from the starboard bank, did not cause loss of control of her steering, and did not precipitate the casualty (as is contended by petitioner).

19. In negotiating the turn in the channel to her port, the UNION RELIANCE pilot ordered her rudder 5 degrees to port. This was at approximately 11:10 p. m. The rudder responded to this movement of the wheel, and the vessel started her turn to port. However, at this point the steering gear of the UNION RELIANCE failed with the rudder in the 5 degree port position, and she continued to swing under that rudder setting. The quartermaster was unable to move the wheel in either direction. She never straightened her course thereafter.

20. When it became evident to the Captain, the pilot, and quartermaster that the wheel would not respond, by engine order telegraph the bridge noti-

fied the engine room to reduce speed, and shortly thereafter to stop. The third mate, who was on watch, was ordered by the Captain to search out the chief engineer and advise him of the rudder failure. The engine room was ordered to give full speed astern to the engines.

21. Recognizing the imminent danger, the pilot of the UNION RELIANCE ordered first her starboard anchor dropped and shortly thereafter her port anchor dropped. At this point (approximately 11:11 p. m.), UNION RELIANCE sounded three blasts on her whistle. This was the only whistle signal sounded by UNION RELIANCE.

22. Efforts to transfer the steering control on the bridge of the UNION RELIANCE from the telemotor system (which had been in use) to the gyro-pilot was unsuccessful, and UNION RELIANCE continued to swing to her port out of control. Prior to the emergency, UNION RELIANCE's four engines had all been coupled in the ahead position for maximum forward speed. On receiving the order for full power astern, the engine room undertook to, and did, reverse one set of two engines, and coupled same to the propeller shaft to give astern power. Nevertheless, the vessel continued in her swing to port with some headway. The remaining two engines were never reversed and coupled to the shaft, for reasons which will be noted hereafter.

UNION RELIANCE continued to have headway until she collided with the port side of the bow of the BEREAN at 11:-13½ p. m.

23. The pilot of the BEREAN observed the UNION RELIANCE as she was in the turn of the channel mentioned above, and about 3 miles away. Prior thereto, BEREAN had been navigating at "full ahead" and was making 13 to 14 knots. On observing UNION RELIANCE coming out of the bend, at approximately Beacon 75 and 76, BEREAN's speed was reduced to "half ahead" and shortly thereafter to "slow ahead". It was at this time that the one blast signal was given by BEREAN.

While it was not answered, the BEREAN pilot expected to make a normal port to port passing.

The pilot of the BEREAN noted, and commented to the watch officer, that UNION RELIANCE was somewhat closer to her starboard bank of the channel than was necessary or customary in making the bend. They watched her swing to her port, and became somewhat apprehensive. BEREAN turned slightly to her starboard, expecting to negotiate the port to port passing. However, a three blast signal from UNION RELIANCE was heard, and the sound of the anchor letting go was heard at approximately the same time, and the pilot of the BEREAN immediately recognized that an emergency presented itself. He blew three blasts in return, and immediately ordered full speed astern on the BEREAN's engines and gave her hard right rudder, intending to put her aground in the mud bank at the side of the channel. These orders were complied with. At this time, the vessels were approximately one-fourth mile apart, and were closing on each other.

24. At this time, and since 11:00 p. m., the BEREAN had been without her regular bow lookout. This resulted from the fact that at 11:00 the lookout had returned to the bridge to relieve the seaman at the wheel. The helmsman, before going forward to assume the bow lookout, was directed to fetch coffee for those on the bridge and was engaged in doing so during this interval.

25. The BEREAN had no one standing by to drop her anchors. When the BEREAN pilot recognized the emergency condition of the UNION RELIANCE (when he ordered the engines full astern, and hard right rudder), he likewise ordered the starboard anchor dropped. The watch officer who was on the bridge with the pilot immediately went forward for the purpose of letting go the anchor. However, before he reached the bow, the watch officer felt BEREAN go aground in the mud, and observed UNION RELIANCE bearing down upon the port bow of his vessel in

such fashion that he recognized that a collision was inevitable. Hence he did not continue forward, and did not let go the BEREAN anchor, but returned to the bridge.

26. BEREAN ran aground into the mud on her starboard side of the channel immediately before or about the time of the impact. She had little, if any, headway, though the violent wheel maneuver and her efforts to stop caused her stern to swing somewhat to port and across the channel. The bow of the UNION RELIANCE struck BEREAN on her port side somewhat behind her stem. The UNION RELIANCE had lost most of her speed at this time. The impact was not severe, and injured no one. It was hardly felt in some portions of the two vessels. However, the bow of UNION RELIANCE breached the No. 1 port tank of BEREAN, causing its acrylonitrile cargo to become ignited and to explode. Quantities of the burning liquid were thrown upon the foredeck of UNION RELIANCE which in turn was ignited. The vessel continued to burn for several days, as noted above, and she became a constructive total loss.

27. As result of the fire caused by the collision, Houston Ship Channel Pilot Duncan and the following crew members of UNION RELIANCE were killed: Lan Jing-Chau, Chen Teh-Yao, Wu Hsing-Rei, Wu Shih-Ming, Pao Fuh-Gen, Huang Ah-Tong, Hu Ah-Wang, Ting Chea-Fah, Yuan Sing-Wang, Hsia Lian-Ken, and Koo Kuang-Yan; and the following were

I. There was much testimony on the trial from both sides attempting to explain the movement of UNION RELIANCE to her port and across the channel. Petitioner's theory was that she had approached too close to her starboard side of the channel and, by reason of suction caused thereby, she had sheered to her port; was never able to right herself; and continued the sheer completely across the channel. This is supported by a little more than (1) evidence that she did in fact approach closer to her starboard bank than was customary, (2) a suggestion from the pilot of the BEREAN that this might have caused her to behave in this manner. There is no

injured: Hau Wen-Tsai and Mang Han-Ying. In addition, much of the cargo of the UNION RELIANCE (principally that in the forward holds of the vessel) was lost, as well as the personal effects of the crew.

*Fault and Negligence*

■ 28. The primary and direct cause of the collision was the failure of UNION RELIANCE to keep to her starboard side of the channel. This resulted from a failure of her port steering system (her starboard steering system having previously failed) and constituted a violation of the provisions of 33 U.S.C.A. §§ 203 and 210. This constituted fault and negligence on the part of UNION RELIANCE.[1]

29. By reason of the extensive damage to the entire bridge, the wheel, and that portion of the telemotor system on the bridge caused by the fire, the cause of the steering failure cannot be determined with as high a degree of certainty as is desired. However, the steering engine room was not damaged. From the evidence which I consider most credible, and the most likely circumstances, it appears, and I find, that the failure of the port steering system resulted from a loss of hydraulic fluid; and the loss of hydraulic fluid, in turn, was caused by the failure of the one horsepower electric motor which powered the replenishing pump for the port steering system.[2]

30. The failure of the small motor powering the port replenishing pump was

substantial evidence that this in fact did cause this movement; while there is uncontradicted evidence from all of the officers and members of the crew of UNION RELIANCE who were in position to know, that her steering system failed.

2. In normal operation, telemotor oil leaks from the main pump into a sump tank. The oil is lifted from the sump tank to an overhead tank, from which it again goes into the system by gravity flow. Thus, if the replenishing pump is not operative (or if the electric motor which powers it is not operative) in a matter of a few hours the oil in the system is exhausted, the system becomes filled with

due to the fact that a fuse was burned out in the electrical lines serving that motor. This occurred in all probability when the port steering system was put in operation following the original steering failure at about 9:00 p. m. This resulted from the fact that the chief electrician made use of a certain wooden block to circumvent the safety and protective feature of an electric solenoid in the electrical system serving this motor.[3]

31. The owners of UNION RELIANCE were at fault and negligent in failing to have had a careful and complete inspection of her steering system prior to the collision. Such an inspection no doubt would have disclosed the use of the wooden blocks, excessive leakage and loss of large quantities of telemotor oil (another possible cause of the casualty), and perhaps other difficulties. In view of the knowledge which the owners had even before accepting delivery of UNION RELIANCE that her main engine room was in a deplorable state from age, excessive wear, and inadequate maintenance; and of the almost constant

---

air, and the rams do not cause the rudder to respond.

This explanation is strongly supported by the uncontradicted testimony that on the occasion of the joint survey the port system was practically devoid of hydraulic fluid, and when power was applied, moved erratically, if at all; but that after some 30 to 35 gallons of telemotor oil was added, it operated properly. I am convinced that this loss of fluid resulted prior to the collision and was the cause of the steering failure. I am unable to accept the explanation offered by petitioner that the oil leaked out after the collision and before the survey.

3. As in the preceding finding, the evidence does not conclusively show the cause of this failure. I credit, however, the following testimony.

Shortly before or in the course of the joint survey a fuse was found to be burned out in the electric circuit which controlled the one horsepower motor serving the port replenishing pump. There is no direct evidence as to when the fuse was blown. However, from the time the vessel was received from its Greek owners, the chief electrician had made use of a wooden block to prop and secure in place an electric solenoid in the electric circuit serving this motor (another block was used in a similar fashion in another line). This solenoid was designed to protect the motor from the full surge of electrical current when the motor is switched on, and to permit the current to be applied gradually. If an unduly heavy surge of current passed through the line, the solenoid was designed to drop open, breaking the circuit, and protecting the motor. The wooden block held the solenoid in place and thus rendered the protective feature inoperative. This was calculated to cause a blown fuse when this motor was engaged.

Had this occurred at about 9:00 p. m. and the system not been replenished with hydraulic fluid, the fluid well might have been exhausted, and the system inoperative, by 11:00 p. m.

This testimony as to the blown fuse came from the witness J. R. Bencal and the following circumstances surrounding this testimony should be noted. Mr. Bencal is a recognized and, I believe, highly regarded marine surveyor in the Port of Houston. As stated earlier herein, he was employed almost immediately following the casualty by the petitioner and undertook to represent petitioner's interest throughout. He was in charge of the team of surveyors representing petitioner at the joint survey (which included Spindanger, an expert on the main engines, and Tarabochia, an expert on hydraulic steering systems). As stated heretofore, Bencal was appointed by the Court as salvage master at petitioner's suggestion, and by reason of his services in this regard in extinguishing the fire, his early examination of the vessel and her cargo, he was probably more familiar with the situation which prevailed aboard UNION RELIANCE following the casualty than any other individual. He was not called as a witness by petitioner. When he likewise was not called as a witness by the respondents (who obviously were fearful of being bound by his testimony), the Court summoned Bencal as a witness and advised all parties that they might cross-examine, and not be bound by his testimony. It was he alone who has testified as to the blown fuse of the electric motor mentioned above. As his memory had been refreshed from notes made at the time and the report written to his principals shortly after the joint survey, I find no reason why his testimony on this point should not be accepted.

difficulties encountered with the main engines, a prudent owner would have anticipated difficulties in the steering system, and would have taken steps to protect against their malfunction.

32. The UNION RELIANCE was unseaworthy from the inception of the voyage in which she was engaged, by reason of the incompetence and inability of her Captain, chief engineer, and other crewman to operate and maneuver UNION RELIANCE properly, efficiently, safely, or within her full potential. Specifically, I find that neither the Captain nor chief engineer was aware of the fact that all four of her main engines might be coupled astern. There was no agreed signal whereby the bridge could order the engine room to couple all four engines astern. By reason of this lack of knowledge, only half of the potential backing power of UNION RELIANCE was applied in an effort to stop her forward movement before the collision. Additionally, the Captain was unaware that reverse power might be applied in a very short time (probably a matter of one minute) if the engine room crew operated efficiently.[4]

33. UNION RELIANCE was at fault in failing to make use of all four engines in going astern immediately prior to the collision. Had the additional astern power been applied, it is highly likely that the collision would have been avoided.

34. The telephone communication system between the bridge, the engine room, steering engine room, etc. aboard the UNION RELIANCE was inoperative. While the bridge might give signals to the engine room by means of the telegraph, there was no other means of communication except (as was done shortly before the collision) to send a messenger, or to station a man with a megaphone midway between the bridge and steering engine room, to relay messages. This obviously made the transmission of messages more difficult and slow, and decreased the efficiency of the vessel.

35. The fault and unseaworthy condition referred to in the preceding paragraphs were the result of petitioner's failure to exercise due diligence to make the UNION RELIANCE seaworthy, and the failure to equip her with a competent and experienced crew. The collision and losses resulting therefrom were occasioned with the privity and knowledge of petitioner.

36. The BEREAN was at fault in failing to have a lookout on the forecastle head from 11:00 p. m. until the time of the collision. On most careful consideration, I find that this failure did not, and could not have caused or contributed to the collision. This is so because Pilot Lary saw the UNION RELIANCE several miles away; observed her lights constantly thereafter; and by reason of his knowledge of and familiarity with the channel, he recognized that she was in difficulty at the earliest mo-

---

4. It is clear from the evidence that neither the Captain nor the chief engineer was aware that the four engines might all be coupled astern, and thought that only two might be so utilized. Spindanger testified that at the time of the repairs at New Orleans on her first voyage, he had explained fully to the engineering officers and crew how to change the engines from ahead to astern; how all four engines might be so utilized; and that the whole operation would take probably one minute. The Captain and chief engineer of that voyage were relieved in Taiwan, and replaced by Captain Shu and chief engineer Hsu Bah. The new chief engineer had never before sailed on a vessel with a similar four-engine arrangement, and had received instructions from his predecessor only during the course of a one day voyage.

On entering the Houston Ship Channel some three days before the accident, the Captain told Houston Ship Channel Pilot Collie that if all four engines were hooked up ahead (as was done to get maximum speed and power in crossing the Galveston Bay portion of the channel), it would require 10 to 15 minutes before any astern power could be applied. Shortly before the collision, the Captain told Houston Ship Channel Pilot Duncan that about 10 minutes would be required to give astern power when the four engines were coupled ahead.

ment which circumstances permitted. He heard the only whistle signals given by UNION RELIANCE, and took immediate action. A lookout could have done nothing more.

37. I find that BEREAN took every reasonable means to avoid the collision after her pilot became aware of the danger.

38. BEREAN was not negligent or at fault in traveling at the speed which she was making prior to the time that she observed UNION RELIANCE and slowed her speed for the anticipated passing.

39. BEREAN was not at fault in failing to have an anchor watch prior to and at the time of the collision. It is not the custom of ships to maintain an anchor watch in this portion of the channel, particularly when the vessel has sufficient power to maneuver readily. Additionally, I find that had the anchor of BEREAN been dropped when her pilot ordered, it would have had little, if any, effect in slowing the vessel under the circumstances which then prevailed, and would not have averted the collision. BEREAN took the quickest and most certain method of losing her headway by running aground.

40. BEREAN was not at fault in carrying acrylonitrile cargo in her forward wing tanks. She violated no Coast Guard regulation by doing so, and I find this was not a negligent or careless manner of loading.[5]

41. BEREAN was not at fault in failing to go to port to undertake a starboard to starboard passing. She had no reason to anticipate that such a maneuver might be called for until long after the time had elapsed within which such passing might have been accomplished safely, if at all.

■ 42. The Captain and chief engineer of UNION RELIANCE were negligent by reason of their failure to familiarize themselves with their vessel and her engines and their failure to make proper use thereof prior to the collision. This negligence constituted a proximate cause of the collision. Any recovery in favor of the Captain and chief engineer will be reduced by fifteen per cent (15%).

■ 43. The chief electrician of UNION RELIANCE was guilty of negligence in failing properly to inspect and maintain the electrical equipment and circuits in the steering engine room of his vessel. This constituted a proximate cause of the collision. Any recovery in favor of the chief electrician should be reduced by twenty-five per cent (25%).

44. The services rendered to the UNION RELIANCE while she was at anchor in Bolivar Roads, and subsequent thereto, by the United States were, in the light of circumstances then existing, reasonable and necessary; and the charges made therefor reasonable in amount and consistent with charges generally made for similar services in that vicinity.

45. Certain speed and performance tests were made of the BEREAN shortly prior to the trial. The purpose was to show how she would react under conditions similar to those which existed at the time of the collision. The tests were made in the area in which the collision occurred. Evidence of these tests was received subject to objection. On careful consideration, I am of the view that these tests were not made with a sufficiently high degree of accuracy, and were not sufficiently consistent within themselves, to be of any probative value. Hence this evidence has not been considered.

5. While petitioner offered evidence tending to show that a greater safety factor would result if there were inner lining of the tank so that an air space was maintained between the skin of the ship and the outer wall of the wing tanks, these experts conceded that it was the custom and practice to carry gasoline and other inflammable and explosive liquids in tanks immediately adjacent to the skin of the ship.

46. From the foregoing findings, it is apparent that in general the Court has adopted the theory and the contentions of BEREAN, and rejected those of UNION RELIANCE. It is felt that the foregoing findings are supported by a clear preponderance of the evidence. It should be noted, however, that on many of the issues the evidence is in sharp and irreconcilable conflict. In weighing the evidence, notice was taken of the fact that several of the principal witnesses of petitioner were impeached regarding matters of great importance. Note is made of the following examples:

(a) some 48 hours following the collision, as the senior surviving and uninjured officer of UNION RELIANCE, the third mate was directed to prepare a report of the casualty for his company. He did so in longhand. While the Captain was hospitalized with severe burns, this report was read to him and received his tacit, if not express, approval and in due course was forwarded to the company. In early pre-trial procedures when extensive exchange of documentary evidence between the parties was had, this report was withheld by petitioner. It was only after trial had begun, and after strenuous efforts by proctor for petitioner, that this document was secured from Taiwan. I am of the view that it was deliberately withheld. This report was inconsistent with the theory advanced by UNION RELIANCE in a number of important respects.

(b) At the original Coast Guard hearing, a few days following the casualty, the chief engineer of UNION RELIANCE testified that his vessel had been using only two engines in running ahead, with two engines standing by to use for astern power. Thereafter the engine room bell book was recovered which showed to the contrary. He changed his testimony thereafter.

(c) The explanation of the chief electrician of UNION RELIANCE regarding his use of the wooden blocks in the starter boxes was entirely unsatisfactory. This is particularly so as he testified that the block in question controlled the replenishing pump motor on the *starboard steering engine* (which, of course, was not in use immediately prior to the collision). Testimony of all of the surveyors showed conclusively that it controlled the replenishing pump motor on the *port* steering engine.

## CONCLUSIONS OF LAW

1. This Court is vested with jurisdiction of these proceedings.

2. Petitioner China Union Lines, Ltd. is not entitled to exoneration from or limitation of its liability with respect to the claims made against it.

3. The UNION RELIANCE was grossly at fault, and in violation of the statutes mentioned above, and she and her owners are held solely responsible.

4. The only fault of the BEREAN having been one which did not and, under the circumstances, could not have contributed to the collision, A/S Andersen & Co., and the BEREAN *in rem* are not liable to any of the libelants who have made claims against them, and are exonerated and freed of liability in these actions.

5. China Union Lines, Ltd. is not entitled to recover any expense from its cargo as general average.

6. China Union Lines, Ltd. is liable to American Cyanamid Company for loss of its cargo aboard the BEREAN.

7. China Union Lines, Ltd., is liable to Lucy Duncan, surviving widow of Houston Ship Channel Pilot Duncan, for his death resulting from the fault and negligence of petitioner.

8. China Union Lines, Ltd., is liable to the legal representatives or next of kin of the members of the crew of UNION RELIANCE who were killed as result of the casualty; and to those members of the crew who received personal injuries or loss thereby, subject to the reduction.

by reason of their own negligence as set out in the preceding findings.

9. China Union Lines, Ltd. is liable to the United States of America for the expenses incurred in connection with this incident and made the subject matter of the claim of the United States.