HESS SHIPPING CORPORATION

v.

The SS CHARLES LYKES, in rem and
Lykes Bros. Steamship Co. Inc.

LYKES BROS. STEAMSHIP CO., Inc.

v.

HESS SHIPPING CORPORATION and
the ST HESS VOYAGER, in rem.

Civ. A. Nos. 4340–66, 4341–66.

United States District Court
S. D. Alabama, S. D.

May 28, 1968.

T. K. Jackson, Jr., and Rae M. Crowe;
Armbrecht, Jackson & DeMouy, Mobile,
Ala., for Hess Shipping Corp.

Edward S. Bagley and Benjamin
Yancey, Terriberry, Rault, Carroll,
Yancey & Farrell, New Orleans, La.,
George Wood, Mobile, Ala., for Lykes
Bros. Steamship Corp.

## OPINION

DANIEL HOLCOMBE THOMAS,
Chief Judge.

This consolidated litigation arises out
of a collision between the SS CHARLES
LYKES and the ST HESS VOYAGER
which occurred on the night of March 3,
1966, at approximately 2210 hours in
the Upper Reach of Mobile Bay Ship
Channel near Buoy No. 42, about one mile
south of the mouth of the Mobile River.

Hess Shipping Corporation as owner
and operator of the ST HESS VOYAGER
filed suit for its damages against Lykes
Brothers Steamship Co., Inc. as owner
and operator of the SS CHARLES
LYKES and against the SS CHARLES
LYKES in rem, and Lykes Brothers
Steamship Co., Inc. likewise filed suit for
its damages against Hess Shipping Cor-
poration and the ST HESS VOYAGER.
The suits were consolidated for trial and
and it was stipulated that the cases would
be tried on the issues of liability and that
the damages would be determined in sub-
sequent proceedings, if necessary.

The CHARLES LYKES is a C-2 type
cargo vessel, 441 feet long, 63 feet wide
and with a gross tonnage of 8,178 tons.
The HESS VOYAGER is a large tanker,
708 feet in length, 102 feet wide and a
gross tonnage of 27,015 tons. Both
vessels were propelled by single screw

steam turbine engines. The HESS VOYAGER was inbound to the Port of Mobile from sea; the CHARLES LYKES was outbound from Mobile to Pasgagoula, Mississippi, a relatively short run from Mobile. Both vessels were light.

The vessels were under the conn of Mobile Bar Pilots. When the pilot of the HESS VOYAGER boarded that vessel at the sea buoy, about 30 miles from the scene of the collision, visibility was good, being about four miles. When the pilot of the CHARLES LYKES boarded his vessel at the Alabama State Docks, approximately three and one-half miles from the scene of the collision, visibility was restricted but was believed to be clearing in that immediate area. Near Beacon #28, approximately one-half the way up the channel, the HESS VOYAGER encountered thick fog. Pilots of the Mobile Bar Pilots Association are equipped with walkie-talkie radios. The pilot of the CHARLES LYKES, before leaving the dock, communicated by voice radio with the pilot of the HESS VOYAGER and was advised by the latter that the HESS VOYAGER was encountering thick fog in the vicinity of Beacon #30, about five miles from the scene of the collision. However, the pilot of the CHARLES LYKES did *not* suggest to the vessel's master that the vessel's departure be delayed for a short while in order to avoid meeting and passing the HESS VOYAGER in fog in the narrowest part of the channel.

The collision occurred in the northern portion of the Upper Reach of Mobile Bay Ship Channel. It is necessary to describe the physical characteristics of this portion of the channel in order to visualize the events leading up to the collision. The channel is 40 feet in depth for a width of 400 feet. Because the sides of the channel are sloped it is possible for vessels drawing less than 40 feet to navigate slightly outside the 400 foot boundaries. On either side of the dredged area are spoil banks covered by three or four feet of water. The channel runs nearly due north and south. There

are but two navigational aids, Buoy #44 and Buoy #42, in this portion of the channel and *both* are located on the eastern side of the channel and are approximately 150 feet eastward of the 400 foot eastern boundary line.

Both vessels were equipped with radar sets. The CHARLES LYKES radar could not be properly operated or relied upon because of the manner in which the booms and their related equipment had been rigged. When the vessel sailed the booms had been left in an upright position rather than being lowered and seated in cradles. The antenna or scanner of the radar was installed on the starboard side of the midshiphouse and did not extend upward as high as the booms in their upright position. This faulty rigging of the booms prevented the radar from detecting targets dead ahead and off the port bow of the vessel and this in turn resulted in the failure of the radar to detect the HESS VOYAGER or the channel markers located on her port side. Conversely, the radar on the HESS VOYAGER was operating properly and was providing its operators with a view of all the channel markers and other vessels.

When fog was encountered the HESS VOYAGER reduced speed to Slow Ahead and commenced sounding fog signals. She met and passed, port to port, several other vessels, including two steamships, without incident. Because of her length, nearly double the width of the channel, she did not consider it prudent to anchor, as this maneuver might have resulted in her blocking the entire channel. Her first radar observation of the CHARLES LYKES came when the vessels were nearly two miles apart. Because the CHARLES LYKES appeared on the radar to be too close to the eastern side of the channel the HESS VOYAGER inquired over the radio if the CHARLES LYKES was equipped with radar and received an affirmative response. When the vessels were one and one-half miles apart the pilot of the HESS VOYAGER again contacted the pilot of the CHARLES LYKES and requested the latter *to move over to his own starboard*

side of the channel so the vessels would clear port to port. This was answered by the pilot of the CHARLES LYKES to the effect that he was in the process of moving over. When the vessels were approximately one-half mile apart, a similar request was made by the pilot of the HESS VOYAGER and the same response as before was received from the CHARLES LYKES.

When the vessels were visually sighted by each other, their bows were only 300 feet apart. They were very nearly head to head; the CHARLES LYKES went in quick succession from Slow Ahead to Half Ahead to Full Ahead on a hard right rudder; the HESS VOYAGER went Full Astern on a right rudder and was aground at the moment of collision. Initial contact was near the bow on the port side of each vessel.

Not surprisingly, the bone of contention consisted of charges by each vessel that the other was on the wrong side of the channel. A preponderance of the more credible evidence shows clearly that the CHARLES LYKES was on the wrong side of the channel. In an effort to avoid the oncoming CHARLES LYKES, the HESS VOYAGER grounded at the moment of collision on the eastern extremity of the channel. She was so far out of the channel that the tug that came to pull her free also went aground. Shortly before the collision, a disinterested witness, the master of the SS Claiborne, made a radar observation of the position of the CHARLES LYKES in the channel; his observation placed her well over on the eastern side of the channel.

■ The CHARLES LYKES charges that the HESS VOYAGER was in violation of Article 16 of the Inland Rules in failing to stop her engines on hearing a fog signal forward of her beam and in failing to navigate so as to have been able to stop within one-half the range of visibility. By including the clause, "so far as the circumstances of the case admit", Article 16 recognizes that literal compliance with its terms is not applicable in every instance. Considering the narrow-

ness of the channel, the size of the vessel and the weather conditions, the HESS VOYAGER was justified in not stopping her engines or attempting to anchor. The question of whether or not she could have stopped her headway by use of her own engines within one-half the range of visibility is not applicable here for it is apparent from all of the evidence that the HESS VOYAGER was aground at the moment of collision and that the CHARLES LYKES would have collided with her even if she had been dead in the water.

The foregoing shall constitute the court's Findings of Fact.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter and of the parties to these consolidated suits.

■ 2. The CHARLES LYKES was guilty of gross negligence in rigging her booms in such a way as to greatly impair the effective use of her radar. Continental Oil Co. v. The M. S. Glenville (S. D.Tex.1962) 210 F.Supp. 865; The Medford (E.D.N.Y.) 65 F.Supp. 622; The T. J. Hooper, (C.A. 2) 60 F.2d 737.

■ 3. The CHARLES LYKES was grossly at fault in failing to maintain a course on her own starboard side of the channel. Inland Rules, Article 25, 33 U.S.C. 210. The Standella (C.A. 5) 108 F.2d 619; The Union Reliance (S.D.Tex. 1963) 222 F.Supp. 874, 882.

■ Any violations of Article 16 of the Inland Rules, 33 U.S.C., 192, on the part of the HESS VOYAGER were technical in nature and cannot be construed as a contributing cause of the collision. The Standella, supra; Compania De Maderas De Caibarien, S. A. v. The Queenston Heights (C.A. 5) 220 F.2d 120; White Stack Towing Corp. v. The Bethlehem Steel Co. (C.A. 4) 279 F.2d 419, 82 A.L.R.2d 757; Universal Ins. Co. v. The Coast Banker, 129 F.2d 395 (C.A. 9); The Providence (The Georgia) (D.C.R.I.), 282 F. 658; The Law of Admiralty by Gilmore and Black, Pages 404-406.

Let an interlocutory decree be entered in favor of Hess Shipping Corporation and against the SS CHARLES LYKES and Lykes Brothers Steamship Co., Inc. holding the SS CHARLES LYKES solely at fault. If damages cannot be settled by consent, either party may make application to the court for further proceedings to determine damages.

### INTERLOCUTORY DECREE

It is ordered, adjudged, and decreed that Hess Shipping Corporation recover of and from the SS Charles Lykes and Lykes Brothers Steamship Co., Inc. the damages sustained by it in consequence of the matters referred to in its Complaint together with interests and costs; and that the Complaint of Lykes Brothers Steamship Co., Inc. be dismissed with costs; and it is further ordered that application for ascertainment of damages may be made to the court by the parties, or any of them, if the same cannot be agreed upon within sixty days from this date.