## UNIVERSAL INS. CO. v. THE COAST BANKER.

### No. 9941.

Circuit Court of Appeals, Ninth Circuit.

July 7, 1942.

396

Lillick, Geary, Olson & Charles and Edwin L. Gerhardt, all of San Francisco, Cal., for appellant.

Dey, Hampson & Nelson and James C. Dezendorf, all of Portland, Or., for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This is a proceeding in admiralty brought in the District Court of the United States for the District of Oregon, pursuant to 28 U.S.C.A. § 41. From a final decree entered in said court on July 29, 1941, dismissing the libel, this appeal is taken.

The libel is in rem against the steamship "Coast Banker", an ocean-going vessel about 260 feet long, owned by the Coastwise Lines, an Oregon corporation. Both the vessel and the corporation are appellees here.

The Knappton Towboat Company is an Oregon corporation, the owner of the diesel tug "Myrtle". It had a contract with the Northwestern Electric Company for towing its barges, and in this contract it assumed the full responsibility for the safety of the barges while they were in its custody. To protect itself against this liability it took out a policy of insurance with the Universal Insurance Company, the libellant herein and the appellant here.

On January 16, 1940, the "Myrtle", with two empty barges of the Northwestern Electric Company in tow on a hawser, was proceeding down the Columbia River. On that day the "Coast Banker" was proceeding up the river, with Captain Horats the pilot in charge. In a dense fog, about three-quarters of a mile above Knapp's Point, Washington, the "Coast Banker" collided with one of the barges, which was crushed and sank. The "Coast Banker" suffered no damage.

The insurance company paid to the Knappton Towboat Company $2,805 in full settlement of the loss, and took a subrogation receipt for this payment, and the Northwestern Electric Company released all claims for damages to the barges in this collision. Thereafter the insurance company instituted this libel.

In addition to the foregoing the trial court found these facts to be true:

Immediately preceding the collision the "Coast Banker" was proceeding south toward Portland and the "Myrtle" and her tow were northbound from Portland for Longview. The "Coast Banker" had entered the Columbia River the evening before, picked up Captain W. F. Horats of the Columbia River Pilots Association and proceeded to Bachelor's Slough three miles northwest of Knapp's Point. After the "Coast Banker" anchored the Steamship "Mericos Whittier" went by going south and likewise anchored three ship lengths ahead.

The fog cleared so that the "Mericos Whittier" and the beach on the Washington shore could be seen from the "Coast Banker" and the pilot decided it was safe to proceed. The anchor was weighed, the "Mericos Whittier" passed, and the "Coast Banker" headed in close to the beach at Knapp's Point so that the Willow Bar Range could be located and the "Coast Banker" placed on the Range and the compass checked.

At Knapp's Point vessels going toward Portland must make a turn to the south and set a new course owing to a bend in the river.

After arriving at Knapp's Point the whistle of a vessel, which later proved to be the "Myrtle", was heard ahead by the pilot and other persons on board the "Coast Banker". The "Coast Banker" was then in close to the beach on the Washington side headed toward the Jetty above the Willow Bar Range about to swing south so as to put the Willow Bar Range astern.

There was danger that the "Coast Banker" could not be directed away from the Jetty toward which it was headed and that it would go aground if the engines were stopped when the fog signals of the "Myrtle" were first heard.

As soon as the "Coast Banker" was steadied on the Willow Bar Range and the danger of going aground or striking the Jetty had passed, the engines were stopped. Before the engines were stopped the "Coast Banker" was running at about two miles an hour. The "Coast Banker" drifted for one minute and then, although all previous signals came from the starboard side of the vessel, the last signal before the "Myrtle" became visible was dead ahead. The "Myrtle" then appeared out of the fog on the port side of the "Coast Banker" headed toward the Washington shore. Immediately thereafter the barges appeared on the starboard side of the "Coast Banker" and its engines were put full astern.

The "Myrtle" left the foot of Southwest Lincoln Street in Portland, Oregon, for the Weyerhaeuser Mill at Longview early on the morning of January 16, 1940, towing two barges of the Northwestern Electric Co. The barges were empty and were being towed tandem on a 300 foot tow line. When the "Myrtle" reached Reeder's Point on Sauvies Island about a mile south of the point where the collision occurred the fog signals of the "Coast Banker" were first heard.

At this time the "Myrtle" was proceeding at half speed, and it continued its speed and course for at least five or six minutes. During all of this time the Captain of the "Myrtle" thought the signals of the "Coast Banker" were from off the port bow of the "Myrtle". As the vessels moved closer the Captain of the "Myrtle" failed to accurately determine tthe location and course of the "Coast Banker" and erroneously concluded that the vessels were coming almost head on, and he thereupon swung the "Myrtle" four or five points to starboard and was on that course headed toward the Washington shore at the time the "Coast Banker" came in view. As soon as the "Coast Banker" came in view the Captain of the "Myrtle" put her engines full ahead causing the barges to be pulled across the bow of the "Coast Banker".

At the moment of impact the barges and the "Myrtle" were going through the water at a speed of at least two miles an hour.

At the moment of collision the "Coast Banker" was either dead in the water or moving ahead very slightly, but in any event the "Coast Banker" stopped well within one-half the range of visibility after the "Myrtle" and her tow came in view.

At and immediately preceding the collision the "Myrtle" and her tow were proceeding on the Willow Bar Range, although the draft of the "Myrtle" and her tow was such that they could have been navigated on either side of the channel clear of the Range.

The "Coast Banker" and those in charge of her navigation were not guilty of actionable negligence proximately contributing to the collision.

From the decree dismissing the libel this appeal is taken. Appellant claims that the District Court erred in the particulars set forth in its assignments of error. These assignments are given here in full because they not only set out the legal contentions made but they also epitomize the argument upon which appellant relies. They are as follows:

"First: In holding that the failure of the 'Coast Banker' to stop her engines when the fog signals of the tug 'Myrtle' were first heard forward of her beam, was not a contributory fault in violation of Inland Rule 16, and that there was danger of her running ashore if her engines had been stopped at such time, and in failing to consider the speed of the 'Coast Banker' at such time, and that she was under no compulsion to navigate at such time in a dense fog so near the shore on her port side that navigation was hazardous, and that there was ample water of sufficient depth on her starboard hand to permit her coming to anchor, and that there were no circumstances which would justify her in proceeding forward on her course for 16 minutes after fog signals were heard ahead, before stopping her engines, and in failing to hold that by reason thereof, the 'Coast Banker' was at fault for the collision.

"Second: In holding that the 'Coast Banker's' speed in the fog then existing was reasonable and that she was able to stop within one-half of her visibility range, and in failing to consider that she did not in fact come to a stop within such range of visibility and that the only evidence from which the distance traveled after the barge was sighted, could be determined was

that of claimant's own witnesses and that it showed conclusively that the 'Coast Banker' did travel more than one-half of her range of visibility before colliding with the barge, and in failing to hold that by reason thereof, the 'Coast Banker' was at fault for the collision.

"Third: That the Court failed to consider that the pilot of the 'Coast Banker' neglected the precautions required by the ordinary practice of seamen and the special circumstances in that he did not reverse his engines until one minute before the collision, and failed to navigate with caution after hearing the fog signals of a tug with a tow forward of his beam, and in failing to hold that by reason thereof, the 'Coast Banker' was at fault for the collision.

"Fourth: The District Court erred in dismissing the libel herein."

Two statutes relating to the navigation of vessels on the inland waters of the United States are cited from the Inland Rules as applicable to the situation, Article 16 (33 U.S.C.A. § 192) and Article 29 (Ibid. § 221). The pertinent portions of these statutes are set forth in the margin.[1]

Appellant emphasizes two contentions which must rest, in the final analysis, upon the facts. It is asserted that the "Coast Banker" was negligently navigated in that it was proceeding at a speed at which she could not be stopped dead in the water in one-half of the visibility before her. The other contention is that the "Coast Banker" did not stop her engines at once when the fog signal was heard, as required by the rule; that the testimony of the pilot in charge of the vessel that if the engines were immediately stopped, the "Coast Banker" would go aground was not sufficient to bring the vessel within the exception to the rule.

As supporting its contentions appellant cites the cases: The Benalla, D.C.N.Y., 45 F.2d 864; The Buenos Aires, 2 Cir., 5 F. 2d 425. There was no attempt in either of these cases to prove that "the circumstances of the case" were such that it would have been dangerous to stop the ship's engines.

The Brittannia, 153 U.S. 130, 14 S.Ct. 795, 38 L.Ed. 660, is also cited. In this case the court refused to accept the excuse offered. At page 140 of 153 U.S., at page 798 of 14 S.Ct., the opinion says: "This alleged danger of running aground on the New York shore, if she continued her course, was not set up in the thrice-amended pleadings, and seems, as well as the suggestion that there were rocks, not shown on the charts, on the course the Beaconsfield was going, to have been an afterthought, by way of excuse, * * *."

In The Silver Palm, 9 Cir., 94 F.2d 754, likewise cited by appellant, the only issue was whether the Navy vessel "Chicago" was also in fault. Here, again, there was no claim that there were any circumstances of danger that precluded the stopping of the ship's engines. The contention was made that the vessel was so constructed that she could not be steered at a less speed than four knots. The court, in denouncing the gross negligence there exhibited, said at page 758 of 94 F.2d: "Since the Chicago could begin to be steered only at four knots, and since she would not have steerage way if she proceeded on that darkest morning according to the requirements of the law of prudent navigation, nothing but sheer reckless disregard for the rules and for the merchant fleet kept her in the lane of traffic instead of turning westerly to the less frequented waters."

Similarly, in the case of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, it was claimed that a speed of seven knots was necessary for safe steerage. The court found against this contention as a matter of fact.

In Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 37 S.Ct. 270, 61 L. Ed. 726, there was no claim that there were any circumstances which made it dangerous to comply with the International Regulations. It was held that when a steam

---

[1] Article 16 is as follows:

"Every vessel shall, in a fog, * * * go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

Article 29 is as follows: "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences * * * of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

vessel proceeding in a fog hears, apparently forward of her beam, the fog signal of another vessel whose position is not ascertained, the duty to stop the engines, if the circumstances admit, is imperative, under Article 16 of the International Regulations, 33 U.S.C.A. § 92; that a negligent breach of this statutory duty, contributing directly to cause a collision, is not excusable upon the ground that the vessel was navigated in accordance with what would have been good seamanship had not the duty been imposed.

In the case of The H. F. Dimock, 1 Cir., 77 F. 226, it was admitted that the vessel was traveling in a fog of great density at a dangerous rate of speed, which was attempted to be justified by claiming, as a special circumstance warranting disregard of the Regulations, that she could not maintain steerage way at lesser speed. The court correctly found the excuse insufficient.

In The Eagle Point, 3 Cir., 120 F. 449, 452, the vessels in question came together in a thick fog at a locality where, the opinion recites, "The courts on both sides of the Atlantic have recognized * * * as one where the presence of other vessels may reasonably be expected, and as calling for the greatest care in case of fog to avoid collisions." Again the excuses offered were held not valid.

■ All the authorities appear to be in harmony in holding that the question of what, if any, exceptional circumstances are dangers of navigation such as may relieve from strict compliance with Article 16, must be determined from the facts of each case.

The weakness of appellant's contention lies in the assumption that the "Coast Banker" violated Article 16. The citations of authority and the argument rest upon the basis that the "Coast Banker" was in fault in not stopping all her engines at once when the fog signals of the "Myrtle" were first heard ahead. But the statute required that the "Coast Banker" should, "so far as the circumstances of the case admit, stop her engines". Admittedly, her engines were not stopped at the moment, and the reasons given were that to do so would cause her to run aground, that as soon as this danger had been passed her engines were stopped. The District Court made this specific finding, and there is evidence in the record to sustain it. Upon

the other point that the "Coast Banker" was proceeding at such speed as to be unable to stop in one-half of the visibility before her, here, also, the finding of the trial court is to the contrary, and again there is in the record evidence to support the finding.

There is a further minor contention, embodied in an assignment of error, that the pilot of the "Coast Banker" was negligent in maneuvering his vessel. The District Court determined otherwise, and held that the "Coast Banker" was properly handled in all respects before the collision, which conclusion is supported by the record and the evidence.

■ In The Chattahoochee, 173 U.S. 540, 548, 19 S.Ct. 491, 494, 43 L.Ed. 801, the Supreme Court of the United States used language which might well be accepted as a general principle: "* * * it is impossible to say what ought to be considered moderate speed under all circumstances. It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

A careful review of the evidence in this case shows that the "Coast Banker" was not in fault. According to members of her own crew she was stopped. The master of the "Myrtle" said she was almost stopped. Just before the collision occurred the master of the "Myrtle" had changed his course so that when the vessels came in sight of each other, the "Myrtle" was off the port bow of the "Coast Banker" and the barges she was towing were off the starboard bow. At the moment of collision the "Myrtle" had cleared the "Coast Banker" but at such an angle that it was inevitable that one of the barges would strike the "Coast Banker". By adopting some mathematical formula appellant endeavors to establish that the "Coast Banker" was moving at a greater speed than the barges. These figures are based upon an approximation of distances not definitely stated, and no witness testified that such was a fact. Indeed, the testimony on this point that might be taken as most favorable to the "Myrtle" would indicate that she and the barges were going at a speed more than twice that of the "Coast Banker" and hence would cover

400

much more than one-half of the visibility at the point of collision.

The District Court was correct in holding that the "Coast Banker" stopped well within one-half of the range of visibility after the "Myrtle" and her tow came in view.

■ The correct decision of this case is almost altogether dependent on the establishment of the facts. The witnesses appeared in person and gave their testimony before the court. The trial judge was therefore in a better position to determine the credibility of the witnesses and to resolve any conflicting statements in establishing the truth. We can find no reasonable ground upon which we could disregard the testimony which the trial court believed. From a consideration of all the evidence and the law applicable thereto we are convinced that the findings and conclusions of the District Court that the "Coast Banker" was properly handled in all respects before the collision and that the vessel and those in charge of her navigation did not contribute to the collision are correct and must be

Affirmed.