633 F.2d 789
 ALKMEON NAVIERA, S.A., a corporation, Plaintiff-Appellant
and Cross-Appellee,
v.
M/V "MARINA L," her engines, boats, tackle, apparel and
furniture, and Elmarina, Inc., a corporation,
Defendants-Appellees and Cross-Appellants.
 Nos. 77-1670, 77-2021.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 5, 1979.
Decided Nov. 18, 1980.
 
 Lawrence D. Bradley, Jr., Lillick, McHose, Charles, Los Angeles, Cal., for Naviera.
 Jack D. Fudge, Los Angeles, Cal., argued, for M/V Marina; McCutchen, Black, Verleger & Shea, Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN and KENNEDY, Circuit Judges, and TAYLOR,* Senior District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 On June 20, 1973, two freighters collided in dense fog off the coast of Baja, California. As a result, one ship, the Theokeetor, sank; the other, the Marina L, was severely damaged. This suit followed. After trial, the district court found both ships at fault, apportioned liability 60% to the Marina L and 40% to the Theokeetor, and denied any prejudgment interest. Both parties appeal.
 
 
 2
 * On the day of the collision, the Theokeetor, owned by appellant Alkmeon Naviera, was heading north out of Tocopillo, Chili, bound for San Pedro. Twenty minutes prior to the collision, it was on a gyro course of 340 degrees true. It had been in fog for over four hours. The district court found that, during this time, it had proceeded at full cruising speed with only one operable radar unit. This unit was set on the twelve-mile range.
 
 
 3
 At the same time, the Marina L, owned by appellee, Elmarina, Inc., was south bound in ballast on a gyro course of 161 degrees or a true course of 159 degrees. The heading of the ships, given their relative positions, essentially put them on a head-on collision course. Fog had surrounded the Marina L for almost two hours and it also was proceeding at full cruising speed.
 
 
 4
 Approximately ten minutes before the collision, the Marina L appeared dead ahead on the Theokeetor's radar at a distance of 3.5 nautical miles. The Theokeetor's master ordered her hard to starboard.[1] To signal the change of course, he blew one blast on the ship's whistle. Four minutes later, the Theokeetor's radar showed the Marina L to be 30 degrees off the port bow. The Theokeetor's master continued the starboard turn and again blew the whistle once. Eight minutes after the first radar sighting of the Marina L, and some two minutes before the collision, the Theokeetor stopped its engines. Throughout this period, neither ship was visible from the other; fog limited visability to 200 meters.
 
 
 5
 Fifteen minutes prior to the collision, the Marina L's captain ordered a change in radar instruments. Although the starboard radar was still cold and untuned, the port radar was switched to standby. The Marina L's captain thereafter relied on the starboard radar for all navigation. This radar, like the Theokeetor's, was set on the twelve-mile range.
 
 
 6
 The Theokeetor first appeared on the Marina L's radar five minutes before the collision. The radar indicated that the Theokeetor was 2.3 nautical miles away. Its master immediately ordered the ship 8 degrees to port and signaled this by two blasts on the ship's whistle. Shortly thereafter, the captain ordered the ship more to port and again blasted the ship's whistle twice. The captain then stopped the engines. One minute prior to the collision, the Marina L's captain heard one blast from the Theokeetor's whistle and ordered the helm hard to port.
 
 
 7
 The blind maneuverings towards the east by both captains had brought the Theokeetor to a position perpendicular to the Marina L. This became apparent when, 20 seconds prior to impact, the Marina L's captain first saw the Theokeetor through the fog. He immediately ordered the engines full astern, but by then collision was unavoidable. The Marina L struck the Theokeetor broadside; the Theokeetor took water and sank.
 
 
 8
 The district court found three causes of the collision: immoderate speed by both ships; improper radar use by both ships; and improper maneuvering by the Marina L. The court assigned 40 percent of the cause of the collision to improper speed, 40 percent to improper radar use, and 20 percent to improper maneuvering. The court found both ships equally at fault with respect to speed and radar use. After finding that the Theokeetor could not have stopped in time, and would have increased the probability of collision by reversing engines, the court apportioned all the maneuvering fault to the Marina L. This resulted in an apportionment of liability of 60% to the Marina L and 40% to the Theokeetor. The Marina L's damages of $930,000, along with the Theokeetor's damages of $3,425,000, were apportioned accordingly.
 
 
 9
 On appeal, the owners of the sunken Theokeetor claim the district court erred in determining and apportioning liability, in assessing the value of their ship, and in denying prejudgment interest. The Marina L, on its cross-appeal, claims error in the district court's determination of the applicable legal standard and in its apportionment of liability. We deal with Marina L's claims first.
 
 II
 
 10
 Elmarina asserts that the district court erred in allocating all the maneuvering fault to its vessel, the Marina L. It claims that the Theokeetor's failure to stop after sighting the Marina L, along with its subsequent turn to starboard, were improper as a matter of law. This claim of an application of an improper legal standard is fully reviewable on appeal and is not subject to the clearly erroneous rule. Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2, 340 F.2d 465, 468 (2d Cir. 1965). See also Stranahan v. A/S Atlantica & Tinfos Papirfabirk, 471 F.2d 369, 372-73 (9th Cir.), cert. denied, 412 U.S. 906, 93 S.Ct. 2293, 36 L.Ed.2d 971 (1973).
 
 
 11
 To decide Elmarina's claim, we must first decide what law controls. In collisions occurring on the high seas, general maritime law usually applies. The Scotland, 105 U.S. 24, 29, 26 L.Ed. 1001 (1881); Fitzgerald v. Texaco, Inc., 521 F.2d 448, 452 (2d Cir. 1975), cert. denied, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976). Where, however, both ships are of the same registry, the law of the common flag applies. The Scotland, 105 U.S. at 29-30; The Belgenland, 114 U.S. 355, 370, 5 S.Ct. 860, 867, 29 L.Ed. 152 (1885); Pacific Vegetable Oil Corp. v. S/S Shalom, 257 F.Supp. 944, 946 (S.D.N.Y.1966). Compare Arbitration of Paeuz-Pamare, 1949 A.M.C. 508, 512 (N.Y.1948) (collision in Gulf of Venezuela between ships of Venezuela registry; Venezuelan law applies) with Arbitration of Catatumbo-Quiriquire, 1949 A.M.C. 513, 520 (N.Y.1948) (collision eight months later in same area between ships of Venezuelan and British registry; lex fori, or New York law, applies). Here, since both ships are of Greek registry, the parties have agreed that Greek law controls.[2] This does not mean, however, that our task becomes one of determining and applying foreign law; Greece, in common with most nations involved in commercial shipping, is a party to the 1960 Safety of Life at Sea Convention (1960 SOLAS). 6B A. Knauth & C. Knauth, Benedict on Admiralty 1064 (7th rev.ed.1969). The United States is also a member of that convention. Id. The provisions and annexes promulgated under the 1960 SOLAS were therefore not only the law of Greece, but also were the positive law of the United States.[3] Act of September 24, 1963, Pub.L. 88-131, 77 Stat. 195; Executive Order No. 239, 30 Fed.Reg. 9671 (1965) (implementing regulations and annexes). The guidelines of the 1960 SOLAS represent a uniform set of internationally recognized navigational rules and thus they have the status of general maritime law. Indeed, Professors Gilmore and Black have noted that "the more competent (ship officers) have most of the (rules) substantially committed to memory." G. Gilmore & C. Black, The Law of Admiralty 489 (2d ed.1975).
 
 
 12
 The parties have also conceded that certain provisions of the 1960 SOLAS control this case. As noted above, however, the provisions of the 1960 SOLAS constitute not only Greek and general maritime law, but American law as well. Thus, we are not presented with the thorny question of whether American precedent is applicable in interpreting another country's general maritime law of personal injury, see id. at 482-84; rather, we are presented with the interpretation of uniform international collision regulations which are not only the law of Greece and the United States, but also are the law of most seafaring nations. In order to achieve the uniformity of application and certainty of decision that the 1960 SOLAS was designed to promote, we consider all apposite precedent; this includes American law as well as the law of other signatories to the 1960 SOLAS. See, e.g., McDonald v. M/V Betty K II, 1958 A.M.C. 523, 525 (S.D.Fla.1958).
 
 
 13
 The 1960 SOLAS Convention, along with the regulations and annexes promulgated under it, provide navigation rules for differing weather conditions. Here, both ships were proceeding in heavily restricted visibility and both were relying on radar navigation. International Rule 16, 33 U.S.C. § 1077 (1976), relating to navigation in restricted visibility, and the radar annex, 33 U.S.C. § 1094 (1976), are applicable.
 
 
 14
 Rule 16 is in three subsections. While all agree that Rule 16(a) is not applicable to the maneuvering claims, the parties differ over whether Rule 16(b)[4] or Rule 16(c)[5] applies. We hold that Rule 16(c) controls.
 
 
 15
 Rule 16(b) establishes the proper conduct for a ship "hearing" the fog signal of another vessel. Rule 16(c), however, applies when the navigating vessel "detects" another vessel before hearing its fog signal.[6] Here, since the Theokeetor detected the Marina L on radar before hearing its fog signal, Rule 16(c) applies.[7]
 
 
 16
 Elmarina claims that Rule 16(c) absolutely required the Theokeetor to stop its engines after the first radar contact; Alkmeon contends that the same rule permitted its turn. Elmarina's claim assumes the existence, at the time of the first radar contact, of a close quarters situation. Rule 16(c) states that, if a close quarters situation cannot be avoided, a ship "shall" stop engines and then "navigate with caution." The district court was, however, equivocal as to the existence of a close quarters situation at the time of the first radar sighting by the Theokeetor.[8] We conclude that this case supports a finding that the Theokeetor's actions were consonant with Rule 16(c) regardless of which subsection is relied upon.
 
 
 17
 Assuming the absence of a close quarters situation, Alkmeon correctly points out that, in such situations, Rule 16(c) permits a ship to take "early and substantial action to avoid a close quarters situation." Recommendation 6 of the Radar Annex, 33 U.S.C. § 1094(6) (1976), states a preference for a starboard turn, such as the Theokeetor's, when ships are approaching on opposite courses. The Almizar, (1971) 2 Lloyd's L.R. 290, 296-97 (House of Lords). See also Moran Towing & Transportation Co. v. United States, 80 F.Supp. 623, 629 (S.D.N.Y.1948). The Theokeetor's decision to go hard to starboard resulted in such a substantial action. See, e.g., The Almizar, supra; Moran Towing, supra ; Meadows, The Radar Annex and Rule 16 of the Regulations for Preventing Collisions at Sea, 1960, As They Affect Navigation in Restricted Visibility, 5 Willamette L.J. 399, 406 n.17 (1969); Murphy, The Legal Implications of Marine Radar, 7 J. Maritime L. & Commerce, 573, 609 (1976). Thus, assuming the absence of a close quarters situation, the Theokeetor's turn was proper under International Rule 16(c).[9]
 
 
 18
 On the facts of this case, however, the Theokeetor's maneuvers were justified even if a close quarters situation was present.[10] When ships are in close quarters, Rule 16(c) initially states an obligation to stop engines-an action the Theokeetor did not take until two minutes before the collision. The language of Rule 16(c), however, is qualified by the further phrase "so far as the circumstances of the case admit." Here, the district court explicitly found that the Theokeetor could not have come to a full stop before the collision. The court further found that any attempt to reverse engines to effect a stop would have swung the Theokeetor's stern to port, thus increasing the danger of collision by forcing the Theokeetor's stern into the path of the approaching Marina L. The question here is whether this case presents one of the few circumstances in which a failure to stop engines is excused.
 
 
 19
 The Fifth Circuit, in interpreting nearly identical language under Inland Rule 16, 33 U.S.C. § 192, has excused literal compliance with the stop engines requirement when "the collision would have in all probability been more serious than it was." The Standella, 108 F.2d 619, 620 (5th Cir. 1939). Accord: Universal Ins. Co. v. The Coast Banker, 129 F.2d 395, 399 (9th Cir. 1942). This logic extends to the Theokeetor's action. As the plain language indicates, the duty to stop is not absolute. See Hess Shipping Corp. v. S/S Charles Lykes, 285 F.Supp. 412, 414 (S.D.Ala.1968), aff'd, 417 F.2d 346, 350 (5th Cir. 1969), aff'd by an evenly divided en banc court, 424 F.2d 633 (1970), cert. denied, 400 U.S. 853, 91 S.Ct. 56, 27 L.Ed.2d 91 (1970); Steffens v. United States, 32 F.2d 206, 207-08 (2d Cir. 1929); United States v. M/S Hoyanger, 265 F.Supp. 730, 732-33 (W.D.Wash.1967) (stopping engines held fault when steerageway lost); Meadows, supra, at 409-10; Murphy, supra, at 605-08. Rule 16(c) excuses the duty to stop engines whenever to do so would increase, rather than decrease, the probability of collision. The Standella, supra ; Universal Ins. Co. v. The Coast Banker, supra. We emphasize the normal procedure is to follow the literal language of Rule 16(c) and stop engines. Here, however, where stopping engines would have left the Theokeetor "helpless in the path of a vessel being operated irresponsibly," Meadows, supra, at 414, such a duty is excused. We therefore affirm the district court's explicit finding that the Theokeetor's maneuvering was proper and did not contribute to the cause of the collision.
 
 
 20
 In addition, we also agree with Alkmeon that the Marina L's maneuvering was improper under Rule 16. While the Marina L took the position in its brief that it "has never sought to defend the navigation and maneuvering of the Marina L," at oral argument it was claimed that if the Theokeetor's turning was proper, then no meaningful distinction could be drawn between turning left or turning right. We reject this claim. As stated above, the annex to the international rules stated a preference for starboard turns. 33 U.S.C. § 1094(6) (1976). It is clear, if from no more than this case, that only one direction should be preferred. We further note that the new regulations go beyond a preference for starboard turns and state that port turns should be avoided. 33 U.S.C. § 1602(b) (Supp. II 1978). We thus find a meaningful distinction, grounded in the applicable regulations, in the different maneuvers taken by these ships. This portion of the judgment is affirmed. See also The Almizar, supra, at 296.
 
 III
 
 21
 Both parties allege that the district court's initial division of fault among three causes was incorrect; the owners of the Theokeetor argue for an 80%-20% split in their favor, while the Marina L urges a 50%-50% division. The Marina L bases its revision on its claims that both parties were equally at fault in maneuvering, thus equalizing the liability under the district court's formula. We rejected this contention above. For their part, the Theokeetor's owners argue that the trial court erred in its relative assignment of fault, allocating too little to the Marina L's maneuvering and radar use, and too much to the Theokeetor's speed.
 
 
 22
 Fact findings made by admiralty trial courts are subject to the clearly erroneous standard of review. Sauers v. Alaska Barge & Transport, Inc., 600 F.2d 238, 244 (9th Cir. 1979); United States v. Standard Oil Co., 495 F.2d 911, 916 (9th Cir. 1974). This standard also extends, under comparative negligence principles, to an admiralty court's apportionment of fault. Valley Towing Service Inc. v. S/S American Wheat, 618 F.2d 341, 346 (5th Cir. 1980); Getty Oil Co. v. S/S Ponce DeLeon, 555 F.2d 328, 334-35 (2d Cir. 1977); Feeder Line Towing Service, Inc. v. Toledo P. & W. R.R., 539 F.2d 1107, 1110 (7th Cir. 1976); American President Lines Ltd. v. E.B. Welch, 377 F.2d 501, 504 (9th Cir.), cert. denied, 389 U.S. 940, 88 S.Ct. 294, 19 L.Ed.2d 290 (1967). Under such a standard, this court must affirm an apportionment of liability unless, after a review of all the evidence, we are left with a "definite and firm conviction that a mistake has been committed." United States v. Standard Oil Co., supra, quoting McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954). We are left with no such conviction here. In cases such as this, where multiple errors of speed, radar use and navigation all combine to cause one collision, the trial judge can best weigh the evidence and apportion fault. After hearing extensive testimony, the trial court found not only that both ships were proceeding at full speed in a dense fog, but also that neither ship detected the other on radar when it should have. This latter finding was supported by expert testimony that, with radar set on the twelve mile scale, the ships should have detected each other at a distance of at least ten miles. The judge also heard extensive expert evidence on the interrelation of all three causes of the collision. The trial court thoughtfully considered these factors in its opinion. Under such circumstances, we decline to disturb the apportionment of fault.[11]
 
 
 23
 The same clearly erroneous standard also applies to the trial court's determination of damages. Darling v. Scheimer, 444 F.2d 514, 515 (9th Cir. 1971); Daniels Towing Service, Inc. v. Nat Harrison Assoc., 432 F.2d 103, 105 (5th Cir. 1970). Alkmeon argues that the trial court was required to give more credence to its experts than to others, solely because they "knew the ship shortly previous to the time it was lost." The Ironmaster, 166 Eng.Rep. 1206 (Adm.1859). We are not convinced. It is for the trier of fact to sift the evidence, discount it for bias or prejudice, and select the most credible testimony. Even in the only American case cited by Alkmeon, The Colorado, 6 Fed.Cas. 160 (E.D.Mich.1872), aff'd, 91 U.S. 692, 23 L.Ed. 379 (1875), the court allowed the trier of fact to select among the proffered classes of evidence for the true value. Id. at 161. We cannot say that the district court committed clear error in valuing the Theokeetor. We thus reject Alkmeon's claims on this point.
 
 
 24
 We also reject Alkmeon's argument that the district court should have increased the Theokeetor's value because of a ship charter entered into just prior to the collision. As shown above, the district court has great leeway in ascertaining damage amounts. The discounted future earning power of a ship, represented by the charter, is a factor to be used in determining present market value; it is not a separate item of damages. Where, as here, the lost ship had a readily ascertainable market value, and that value is awarded, we will not award potentially duplicative items of damage in order to compensate; market value accomplishes this. Barger v. Hanson, 426 F.2d 640 (9th Cir. 1970); The Hamilton, 95 F. 844 (E.D.N.Y.1899).
 
 IV
 
 25
 The district court denied prejudgment interest, stating only that "the peculiar circumstances of the case" did not entitle either party to such an award. The court gave no further explanation.
 
 
 26
 With regard to prejudgment interest, the rule in this circuit has long been that:
 
 
 27
 The total loss of a vessel cannot be fully compensated by payment years after of no more than her value at her sinking or destruction. The owner has neither the use of the vessel nor her money equivalent during this period, and interest on her then value is necessary for just compensation. So also with reference to monies expended in repairs or replacements. Interest here, as in ordinary business transactions, is the usual and ordinary method of making full restitution. The District Judge's discretion should be exercised to accomplish such restitution unless peculiar facts deprive libelants of their right to just compensation for the wrong done them....
 
 
 28
 The President Madison, 91 F.2d 835, 845 (9th Cir. 1937).
 
 
 29
 While the award of prejudgment interest is in the discretion of the trial judge, this discretion must be "exercised with a view to the right to interest unless the circumstances are exceptional." Id. at 847. The rationale for restricting discretion to exceptional cases is that, in admiralty collisions, prejudgment interest is an element of compensation and not a penalty. Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372, 373 (8th Cir. 1980); Rosa v. Insurance Co. of Pa., 421 F.2d 390, 393 (9th Cir. 1970). As such, it is usually denied only when a party "deprive(s) himself of interest." The President Madison, 91 F.2d at 847. Unwarranted delay by counsel is the most common ground for denial, American Zinc Co. v. Foster, 441 F.2d 1100, 1101 (5th Cir.), cert. denied, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); The President Madison, 91 F.2d at 847, but other cases arise. This circuit, for example, has denied prejudgment interest where there was less than actual loss and no proof of deprivation of use, Firemen's Fund Ins. Co. v. Standard Oil Co. of Cal., 339 F.2d 148, 159 (9th Cir. 1964); where the parties have excluded prejudgment interest in their stipulation of damages, Grace Line, Inc. v. Todd Shipyards Corp., 500 F.2d 361, 366 (9th Cir. 1974); or where the parties assert claims or defenses in bad faith, Darling v. Scheimer, 444 F.2d 514, 515 (9th Cir. 1971). Other circuits have considered uncertainty regarding claims or damages as "peculiar circumstances." Sinclair Refining Co. v. S/S Green Island, 426 F.2d 260, 262 (5th Cir. 1970). Contra: Ore Carriers of Liberia, Inc. v. Navigen Co., 305 F.Supp. 895, 897 (S.D.N.Y.1969), aff'd, 435 F.2d 549, 551 (2d Cir. 1970).[12]
 
 
 30
 On the present record, we find none of these peculiar circumstances. The complaint was filed within two months after the collision and both parties proceeded expeditiously to trial. In addition, both parties conceded some fault. The Marina L has never denied it was proceeding at full speed in a fog; the Theokeetor never seriously denied committing some radar error. Thus, the only real dispute was over allocation of fault and assessment of damages. We cannot say that such disputes, common to all actions, when pressed in good faith constitute a bar to prejudgment interest in the absence of a specific finding by the district court. See Socony Mobil Oil Co. v. Texas Coastal & Int'l, Inc., 559 F.2d 1008, 1014 (5th Cir. 1977); Mid-America Transportation Co. v. Rose Barge Line, Inc., 477 F.2d 914, 916 (8th Cir. 1973); American Zinc Co. v. Foster, 441 F.2d at 1101. Otherwise, the compensatory purpose of prejudgment interest would be frustrated in cases of honest and forthright dispute.
 
 
 31
 We thus reverse this aspect of the district court's order. We remand for a determination of the existence of "special circumstances," and, if they are found lacking, for a computation of prejudgment interest. See, e. g., United States v. M/V Gopher State, 614 F.2d 1186, 1190 (8th Cir. 1980); Sabine Towing & Transportation Co. v. Zapata Ugland Drilling, Inc., 553 F.2d 489 (5th Cir.), cert. denied, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).
 
 
 32
 AFFIRMED IN PART, REVERSED AND REMANDED with respect to prejudgment interest.
 
 
 
 *
 Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation
 
 
 [1]
 There was evidence that the Theokeetor's master studied the radar for almost a minute before ordering the turn. While the preferred action would have been to plot the movements of the Marina L, see Murphy, The Legal Implications of Marine Radar, 7 J. Maritime L. & Commerce 573, 593-4 (1976), the district court found that both ships' improper speed and radar use precluded the effective use of this method. Thus, as will be seen, the Theokeetor's master did the best he could under the circumstances
 
 
 [2]
 Greek law not only provides the controlling rules of law, but also governs fault allocation and evidentiary presumptions. See, e.g., Ishizaki Kisen Co. v. United States, 510 F.2d 875, 882 (9th Cir. 1975). Greece, as a signatory to the 1910 Brussels International Convention with Respect to Collision, adopts a comparative fault principle (Article 4) and entertains no evidentiary presumptions, (Article 6). 6 A. Naught & C. Naught, Benedict on Admiralty 39 (7th rev.ed.1969)
 
 
 [3]
 During the pendency of this action, the 1960 regulations and annexes, codified at 33 U.S.C. § 1053; 1061-1094 (1976), were rescinded. Regulations from the 1972 SOLAS Convention took their place. Act of July 27, 1977, Pub.L. 95-75, 91 Stat. 311. The new act, however, provided for the validity of the old rules in all collisions occurring prior to the date of repeal. Id. § 10
 
 
 [4]
 International Rule 16(b), 33 U.S.C. § 1077(b) (1976), states:
 A power-driven vessel hearing, apparently forward of her beam, the fog-signal of a vessel the position of which is not ascertained shall so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over.
 
 
 [5]
 International Rule 16(c), 33 U.S.C. § 1077(c) (1976), states:
 A power-driven vessel which detects the presence of another vessel forward of her beam before hearing her fog signal or sighting her visually may take early and substantial action to avoid a close quarters situation, but, if this cannot be avoided, she shall, so far as the circumstances of the case admit, stop her engines in proper time to avoid collision and then navigate with caution until danger of collision is over.
 
 
 [6]
 Detection by radar usually requires more than a single range and bearing. Murphy, supra note 1, at 609. See also 33 U.S.C. § 1094(3) (1976) (single range and bearing insufficient under International Rule 16(b) to relieve duty to stop engines). Here, however, although the Theokeetor's master did not plot the path of the Marina L, we can say that, under the circumstances, his ship detected the Marina L within the meaning of International Rule 16(c). See note 1 supra
 
 
 [7]
 The difference in language between International Rule 16(b) and 16(c) is relevant only if a close quarters situation is not present. Rule 16(c), added by the 1960 SOLAS Convention, allows the ship to maneuver as discussed infra in order to avoid a close quarters situation. If a close quarters situation cannot be avoided, Rule 16(c) and Rule 16(b) require the same action: stop engines so far as the circumstances of the case admit. See Murphy, supra note 1, at 609
 
 
 [8]
 The court found that a close quarters situation eventually developed, but made no explicit finding as to the existence of a close quarters situation at the time the Theokeetor first made radar contact with the Marina L. As explained in note 7, supra, this determination is usually critical to the analysis. Here, however, the district court made sufficient findings to support its judgment
 
 
 [9]
 The new regulations, promulgated under the 1972 SOLAS Convention, are stronger. Instead of preferring a starboard turn, new International Rule 19(d) states that if a risk of collision is present, then any course alteration to port shall, so far as possible, be avoided. This new rule has the force of law. 33 U.S.C. § 1602(b) (Supp. II 1978)
 
 
 [10]
 The existence of a close quarters situation is a question of fact to be determined from the surrounding circumstances. For large, ocean going vessels, objective estimates range from two miles, Murphy, supra note 1, at 609 n.131 (quoting the British Admiralty's Manual of Navigation) to almost five miles, Meadows, The Radar Annex and Rule 16 of the Regulations for Preventing Collisions at Sea, 1960, As They Affect Navigation and Restricted Visibility, 5 Willamette L.J. 399, 408 n.20 (1976). Functional definitions generally are stated in terms of the distance in which the fog horn of the ship may be heard. Id
 
 
 [11]
 Under such a standard, we find Elmarina's citation of cases such as The Verena, 2 Lloyd's L.R. 127 (Ct.App.1961) to be inapposite. The Verena dealt directly with fault allocation. There, the appellate court rejected the lower court's allocation of causation; the higher court felt that the lower court accorded too little weight to the ships' immoderate speed. Id. at 134-35. It then reweighed the evidence and adjusted the relative liabilities of the parties. We, however, have no such license. Whatever the English rule for de novo admiralty review might be, in cases such as this, our clearly erroneous standard prevents us from similarly reapportioning liability on appeal. See United States v. Staples, 256 F.2d 290, 293 (9th Cir. 1958); Petterson Lighterage & Towing Corp. v. New York Central RR, 126 F.2d 992, 995 (2d Cir. 1942) (L. Hand, J.)
 
 
 [12]
 Mutual fault is also occasionally listed as a reason for denying prejudgment interest. See, e.g., Afran Transport Co. v. The Bergechief, 285 F.2d 119, 120 (2d Cir. 1960). The Supreme Court, however, has long approved prejudgment interest in mutual fault cases. See The Manitoba, 122 U.S. 97, 7 S.Ct. 1158, 30 L.Ed. 1095 (1887). Further, courts have denied prejudgment interest in mutual fault cases in order to mitigate the harsh effects of the old equal division of damages rule. Iberian Tankers Co. v. Gates Constr. Co., 504 F.2d 747, 748 (2d Cir. 1974). These courts recognized that, in cases of slight negligence, prejudgment interest actually penalized the less culpable party. Id. This party, if prejudgment interest were imposed, would pay interest on one-half of the other party's damages, rather than interest on the lesser proportion of damages caused. Further, the more negligent party would receive more than his proper share. The unfairness of this penalty to the paying party, along with its concomitant over-compensation, was thought to exceed any compensation running to the receiving party, and interest was accordingly denied
 The equal division of damages rule, however, was abrogated by United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Thus, denial of prejudgment interest on mutual fault grounds would seem no longer necessary, since distortions in compensation can no longer occur. In addition, since this action is governed by the 1910 Brussels Convention, the perceived need to deny interest in order to avoid the equal division of damages rule has never existed.
 Finally, under any rule allowing apportionment of liability, denying prejudgment interest on the basis of mutual fault would seem to penalize a party twice for the same mistake. See Complaint of B.F.T. No. Two Corp., 433 F.Supp. 854, 876 (E.D.Pa.1977).