**PROTECTUS ALPHA NAVIGATION CO., Plaintiff,**

v.

**NORTH PACIFIC GRAIN GROWERS, INC., Defendant.**

**Civ. No. 82–219–SO.**

United States District Court, D. Oregon.

April 20, 1984.

As Amended May 18, 1984.

Damages Assessed May 18, 1984.

John R. Brooke, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., for plaintiff.

Kenneth E. Roberts, Schwabe, Williamson, Wyatt, Moore & Roberts, Dean D. DeChaine, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendant.

## OPINION

SOLOMON, District Judge:

Protectus Alpha Navigation Co. (Protectus) is the owner of the M/V PROTECTOR ALPHA, a diesel-driven bulk grain carrier of Cypriot registry. The ship came up the Columbia River on February 13, 1982 to load wheat at a grain facility owned by North Pacific Grain Growers, Inc. (North Pacific). The ship docked shortly before midnight, and about twenty hours later a fire broke out. Protectus asserts that as a result of the negligence of North Pacific, the ship became a total loss.

Protectus filed an action against North Pacific for: (1) compensation for the loss of the ship; (2) expenses incurred in firefighting and salvage and pollution control; and (3) indemnity for third-party claims arising from the death and injuries to the Coast Guardsmen and the loss of the ship's cargo. Protectus also requests punitive damages. A court trial was held, limited primarily to the issue of liability.

### Facts

On February 14, 1982 at about 7:00 p.m., an oil barge operated by Don Stein began to pump diesel fuel into the PROTECTOR ALPHA. About thirty minutes later, Jose Travenia, an oiler for the ship, went into the engine room where he saw flames nine to ten feet high in the generator flat. The fire apparently started when diesel fuel spilled from an overflowing tank and ignited on the hot exhaust manifold of the generator. Travenia tried to put out the fire with a portable fire extinguisher. He became lost in heavy black smoke.

Shore personnel telephoned the fire department. Richard Merz, a volunteer fireman with the Kalama Fire Department, was the first firefighter to arrive at the dock. Assisted by crew member Arturo Miralles, Merz located and rescued Travenia, the lost oiler. Meanwhile, firefighters and firefighting equipment from Cowlitz County, Kalama, and Longview arrived at the dock. After Travenia was rescued, the firefighters attempted to seal off and discharge $CO_2$ into the engine room. There was testimony that if the firefighters had been able to release $CO_2$ when the fire was discovered, the fire would have been extinguished, but they could not do it while Travenia was trapped in the area for fear of killing him.

At about 8:30 p.m., and after the $CO_2$ had been applied, Chief Dan Baxter and Assistant Chief Donald McWain of Cowlitz County Fire District entered the generator flat. The generator flat is an area approximately 20' × 20' open on one end. They observed

from the crosswalk that the $CO_2$ had reduced the fire from flames to an orange glow.

When Captain Greiner of the Coast Guard arrived at 9:15 p.m., Chief Baxter explained his plan to shoot Aqueous Film Forming Foam (AFFF) onto the fire from the crosswalk. 75 gallons of 3% AFFF and 130 gallons of 6% AFFF were on the dock. Another 200 gallons were on the way from Vancouver, Washington. Three fire engines and other equipment necessary to pump the foam were on the dock. The hoses, connectors, and attachments were in place and foam was about to be introduced into the line.

Shortly before 9:30 p.m., North Pacific's dock foreman, Harry "Swede" Anderson, arrived at the dock. Within five minutes, Anderson, without consulting any of the firefighters, ordered the ship cast off from the dock. He gave the order in spite of the fact that Curtis LaRoy, a substitute foreman who had been at the dock for an hour, had urged Anderson to consult with the firefighters before he released the ship.

Chief Baxter and Assistant Chief Robert Mesneak of the Longview Fire Department shouted to Anderson and urged him not to cast off the ship. Anderson shouted an obscenity and released the last line that held the ship at the dock.

When fireman Merz saw that the fire hoses attached to the ship had become taut as the ship was moving away from the dock, he ordered the lines released.

Smoke had choked the ship's engines so that she was without power. A tugboat steered the ship to the edge of the channel but could not hold her there. The ship's anchor was dropped to keep her from drifting in the river. The ship was then about 1,000 yards downstream from the dock.

The firefighters' substitute plan to fight the fire was unsuccessful. They had intended to shoot high expansion foam into the engine room, but equipment from the dock had to be ferried out to the ship and raised on ropes to the deck. By the time the necessary equipment reached the ship,

the engine room was too hot to enter. It was decided to pump the foam through a hole into the engine room.

At 5:12 a.m., when Coast Guard workers were cutting a hole into the bulkhead in the engine room, a crankcase in the engine room exploded. One Coast Guardsman was killed and another was seriously injured. The explosion broke open the sealed engine room, and fed by oxygen, the fire spread rapidly to the ship's superstructure. At 5:55 a.m., Captain Greiner abandoned firefighting efforts, and the burning ship was beached downstream. The fire burned for three more days.

### Claims

■ Protectus argues that North Pacific's employees were guilty of negligence as a matter of law when, in violation of Washington statutes which prohibit interference with public officials in the performance of their duties, they released the PROTECTOR ALPHA from the dock.

North Pacific contends that the loss of the PROTECTOR ALPHA and her cargo was caused by plaintiff's own negligence. The defendant also asserts that it was reasonable and prudent for its employees to cast off the ship, and that their conduct was justified by necessity.

### Negligence Per Se

Washington Revised Code section 9A.76.-020, *Obstructing a public servant*, provides in part: "Every person who * * * (3) shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties ... shall be guilty of a misdemeanor." Protectus alleges that North Pacific's employees violated that section and also section 13.102 of the Uniform Fire Code which is incorporated into Washington law by section 19.27.030(3) of the Washington Revised Code. Section 13.102 provides:

> Any person who obstructs the operations of the Fire Department in connection with extinguishing any fire, or other emergency, or disobeys any lawful command of the chief or officer of the Fire Department who may be in charge at

such a scene, or any part thereof, or any police officer assisting the Fire Department, shall be guilty of a misdemeanor.

Washington courts hold that the violation of a statute that is intended to protect against injury to persons or property constitutes negligence *per se*. *Bernard v. Portland Seattle Auto Freight*, 11 Wash.2d 17, 118 P.2d 167, 169 (1941). This is such a statute.

When Anderson reached the dock, he saw uniformed firemen, and he also saw that firefighting equipment on the dock had been attached to the ship. Within five minutes of his arrival, without consulting any of the firefighters, Anderson released the ship's mooring lines. When he and Van Skike released the lines, twelve people, with very little firefighting equipment, were stranded on board the ship. Their interference with the firefighters' operations endangered the lives of those on board the ship and hindered efforts to fight the fire. Their conduct was a violation of section 9A.76.020 of the Washington Revised Code.

I also find that Anderson, in violation of section 13.102 of the Uniform Fire Code, disobeyed the lawful commands of two fire chiefs, Baxter and Mesneak, who ordered him not to cast off the ship. Anderson's testimony that he did not hear anyone order him not to cast off the ship is not credible.

North Pacific argues that section 13.102 of the Uniform Fire Code is inapplicable because the legislative purpose in incorporating the section into state law was "to set standards for the fire protection and specifications in buildings." North Pacific alleges that the statute is not intended to protect "a foreign shipowner or its burning ship tied up at a Washington dock." North Pacific's argument is without merit. Section 19.27.020, which sets out the purpose of Chapter 19, provides, in part:

The purpose of this chapter is to provide building codes throughout the state. This chapter is designed to effectuate the following purposes, objectives, and standards:

(1) To promote the health, safety and welfare of the occupants *or users* of buildings *and structures and the general public*. (emphasis added)

The statute is applicable to firefighting operations on a dock.

Anderson's violation of the statute endangered the lives of those on the ship and hindered efforts to fight the fire. Defendant's violation of section 9A.76.020 of the Washington Revised Code and section 13.-102 of the Uniform Fire Code, which is part of the Washington Revised Code, constituted negligence *per se*.

In addition to being negligent as a matter of law, North Pacific was guilty of gross negligence when its employees, knowing that firefighting was underway and that people were on board the ship, ordered the ship released without any investigation of the situation and in defiance of the fire chiefs' orders.

North Pacific, on the other hand, contends that Protectus' own negligence caused the fire to burn out of control. North Pacific asserts that the PROTECTOR ALPHA crew panicked and abandoned ship when the fire broke out, and that the ship's firefighting equipment was inoperable.

I find that the crew acted reasonably after the fire was discovered. The fuel tank valves were closed within seconds of the discovery of the fire. The fire alarm was sounded, and a dock security guard was asked to call the fire department. Attempts were made to seal off the engine room as soon as Travenia was rescued. The ship's $CO_2$ system was activated. When the crew abandoned ship, it was on the orders of fireman Merz of the Kalama Fire Department. Some of the crew members returned to the ship shortly thereafter to help fight the fire.

The ship's $CO_2$ system complied with the requirements of the International

Convention for Safety of Life at Sea (SO-LAS)[1] and was discharged properly.

The emergency fire pump on the ship was not activated because the threads on the ship's hydrant did not match the fittings on either the Coast Guard's vessel or the fire department's equipment.

I find no negligence on the part of the crew or the shipowner.

*Causation*

Plaintiff contends that the fire would have been extinguished in a matter of minutes, and that the vessel would not have been a total loss, if she had remained moored to the dock.

After the vessel was released, firefighting was delayed for hours. Firemen Baxter, Mesneak, McWain, and Greiner all testified that before the ship was released, the fire was within minutes of being extinguished. Once cast adrift, the ship was doomed.

I do not find it necessary to consider the Pennsylvania rule because I find that, even without imposing the burden of proof as set forth in *THE PENNSYLVANIA,* 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1876), the overwhelming evidence establishes that North Pacific's negligence caused the loss of the PROTECTOR ALPHA.

*The Necessity Defense*

■ North Pacific contends that Anderson's decision to release the mooring lines and cast off the ship was a prudent response to the emergency created by the fire. North Pacific asserts that its conduct was justified by necessity because Anderson and Van Skike had reason to fear that the fire would trigger an explosion in the grain storage facility.

The defense of public necessity excuses a defendant from liability when, in an attempt to avert a public danger, he destroys the property of another. The defense applies only when the emergency justifies the action and when the defendant acts reasonably under the circumstances.

■ The doctrine of private necessity allows a defendant to interfere with another's property to protect himself, his property, or some other person. But the private necessity defense also requires that the defendant's conduct be reasonable. Private necessity does not excuse the infliction of harm on another's property. *See generally,* W. Prosser, The Law of Torts § 24 (1971); Restatement (Second) of Torts §§ 262, 263 (1977).

■ Here, the danger of explosion was not sufficiently imminent to justify Anderson's conduct, and his conduct was not reasonable under the circumstances. It is true that if North Pacific's grain elevator had exploded, it would have had a devastating effect on life and property in the area. Therefore, if there had been some likelihood that a spark from the fire would cause an explosion in the grain elevator, Anderson would have been justified in taking extreme action to prevent such a contingency. But an explosion at the time Anderson acted was extremely unlikely. It is highly improbable that a spark could have been carried from the ship to the grain gallery since a steady drizzle was falling and the wind was blowing away from the dock. The fire was small and confined to the engine room.

Nor is it likely that the vapors necessary for a combustion explosion were present. The grain had been loaded seventeen hours before the fire; the combustible grain dust had had time to settle. The substances which fed the ship's fire were diesel, lubricating oil, and bunker fuel, all of which are heavy and slow to vaporize. North Pacific's own expert, Roger Strehlow, testified that he had never heard of an explosion from these substances. There were no acetylene tanks in the engine room. The presence of smoke and $CO_2$ in the engine room would have eliminated most of the oxygen so that it would not be available to

---

1. The guidelines of SOLAS represent a uniform set of internationally recognized navigational rules. They have the status of general maritime law. *Alkmeon Naviera, S.A. v. M/V Marina L.,* 633 F.2d 789, 793 (9th Cir.1980).

mix with vapors to form an explosive mixture.

Vernon Clancey, another expert witness for North Pacific, acknowledged that he knew of no occasion in which a shipboard fire triggered a grain elevator explosion.

There was no reasonable basis, even with the information available to him, for Anderson to believe that an explosion was likely. But even if there had been, his decision to cast off the ship was not reasonable. The grain facility could have been protected by much less drastic methods. The inside of the grain elevator could have been hosed down with water. North Pacific's employees did this routinely before welding to prevent sparks from igniting the grain dust.

As a second alternative, Anderson could have followed LaRoy's suggestion, approved by the firefighters, that the ship be pivoted on its stern line so that the stack would be moved farther away from the grain gallery. Firemen and ship crewmen had loosened the lines with this objective.

Anderson's conduct was not justified by necessity.

*Punitive Damages*

■ Protectus contends that punitive damages should also be assessed against North Pacific because Anderson and Van Skike acted in accordance with company policy. North Pacific insists that Anderson and Van Skike were correct in casting off the ship because of the extreme hazard of an explosion and has commended them.

Protectus asserts that a company policy that requires casting off of all burning ships regardless of the circumstances constitutes "deliberate and wanton disregard of the property of the shipowner and the lives of the crew and firemen." It also asserts that North Pacific's endorsement of Anderson's and Van Skike's conduct violates societal interests and should be punished.

When a cause of action arises under maritime law, damages issues are decided under federal rather than state law. *Pizani v. M/V Cotton Blossom,* 669 F.2d 1084,

1088 (5th Cir.1982); *Robinson v. Pocahontas, Inc.,* 477 F.2d 1048, 1052 (1st Cir.1973); *Petition of U.S. Steel Corp.,* 436 F.2d 1256, 1278 (6th Cir.1970), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971).

■ Punitive damages are recoverable in an admiralty action. *The Amiable Nancy,* 16 U.S. (3. Wheat.) 546, 4 L.Ed. 456 (1818). They are discretionary with the trial court and are appropriate when the defendant is guilty of gross negligence or reckless and wanton misconduct. *In re Marine Sulphur Queen,* 460 F.2d 89, 105 (2d Cir.1972), *cert. denied* sub nom. *United States Fire Insurance Co. v. Marine Sulphur Transport Co.,* 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972). *Complaint of Merry Shipping, Inc.,* 650 F.2d 622, 625 (5th Cir.1981).

■ Five minutes after Anderson arrived at the dock, he ordered the ship cast off. He knew nothing of the size or location of the fire, he did not consult with any of the firefighters, and his order was in direct conflict with theirs. If Anderson had not been so hasty, he would have discovered that the fire was on the verge of being extinguished and that there was no danger of an explosion. His perversity turned a small shipboard fire into a marine disaster.

When Anderson and Van Skike cast off the ship, they knew that firefighters were on board. Van Skike testified that he considered the ship a "ticking time bomb," and yet both he and Anderson, without consulting the firefighters who were on the scene and who were acquainted with the problems, ordered the lines which held the ship to the dock loosed. This caused the ship to drift without power. They knew that people were on the ship but did not warn them of their proposed action. There were twelve firefighters on the ship, one of whom was killed and another seriously injured. Witness John Connell, a fire investigator and an attorney from New York City, testified that Anderson's conduct, had it occurred in New York, would probably

have resulted in Anderson's being indicted for involuntary manslaughter.

The conduct of Anderson and Van Skike and North Pacific's approval of such conduct was unconscionable and merits the imposition of punitive damages. *The Amiable Nancy,* supra; *Pacific Packing & Navigation Co. v. Fielding,* 136 F. 577, 579–80 (9th Cir.1905); *United States Steel Corp. v. Fuhrman,* 407 F.2d 1143, 1146–48 (6th Cir.1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970). *Complaint of Merry Shipping,* 650 F.2d at 625. Accordingly, I hold that Protectus is entitled to punitive damages against North Pacific.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

### ASSESSMENT OF DAMAGES

In my opinion dated April 20, 1984, I held that plaintiff was entitled to compensation for the loss of its ship, for the expenses incurred in firefighting and salvage, and for punitive damages. I segregated the issue of damages from liability.

The parties have stipulated that the value of the ship just prior to the fire was $7,500,000, and that the net salvage recovery was $555,000. They also stipulated that the plaintiff's expenses resulting from defendant's negligence amounted to $700,-000. I find that the damage to the vessel resulting from the fire before the defendant's negligence was $600,000.

The plaintiff is therefore entitled to $7,045,000, which together with interest of $2,032,760, totals $9,077,760 as compensatory damages. Interest was calculated at 13.143% from February 15, 1982 until May 18, 1984—the date of the entry of this judgment.

I also find that plaintiff is entitled to $500,000 punitive damages and costs.

All amounts shall bear interest from the date of the entry of this judgment.